963 A.2d 818

PIERMOUNT IRON WORKS, INC., PLAINTIFF–RESPONDENT, AND TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, F/K/A THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS, PLAINTIFF–INTERVENOR–RESPONDENT, AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, FOR THEMSELVES AND AS ASSIGNEES OF J.T. MAGEN & COMPANY, INC., PLAINTIFF–INTERVE-NOR, v. EVANSTON INSURANCE COMPANY, DEFENDANT–APPELLANT, v. MORRIS WINOGRAD AGENCY AND INSU-REX, INC., DEFENDANTS–RESPONDENTS.

Argued November 17, 2008—Decided January 29, 2009.

La page est presque entièrement constituée de barres noires (contenu caviardé), avec seulement le numéro de page visible.

*Anthony M. Pisciotti* argued the cause for appellant (*Pisciotti, Malsch & Buckley,* attorneys; *Mr. Pisciotti* and *William J. Buckley,* on the briefs).

*George J. Kenny* argued the cause for respondent Piermount Iron Works, Inc. (*Connell Foley,* attorneys).

*Alan H. Bernstein* argued the cause for respondent Insurex, Inc. (*Wolf Block Schorr* and *Solis-Cohen,* attorneys; *Mr. Bernstein* and *Stuart J. Polkowitz,* on the brief).

*Wendy L. Mager* argued the cause for intervernor-respondent Travelers Property Casualty Company of America (*Smith Stratton,* attorneys).

*Frank Lerner* submitted a letter in lieu of brief on behalf of respondent Morris Winograd Agency (*Lerner, Piermont & Riverol,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

New Jersey's insurance regulations require licensed writers of commercial insurance policies to provide written notice of nonrenewal to policy holders. *See N.J.A.C.* 11:1–20.1(a) and 20.2(a). Failure results in automatic policy renewal and continued coverage until such time as the insurer provides appropriate notice of termination or renewal. *See N.J.A.C.* 11:1–20.2(j). Among the few exceptions to that requirement is one that is significant to the dispute that spawned this appeal. Subsection (a) of *N.J.A.C.* 11:1–20.1 expressly exempts surplus lines carriers from the regulation's requirements. A "surplus lines insurer" is "an unauthorized insurer in which an insurance coverage [in New Jersey] ... may be placed" through operation of surplus lines law, *N.J.S.A.* 17:22–6.40 to –6.69 (surplus lines law). *See N.J.S.A.* 17:22–6.41; *see also N.J.S.A.* 17:22–6.42 (setting conditions for allowing surplus lines coverage through unauthorized insurers when coverage cannot be procured from authorized insurers); 1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance* § 2.17 (2d ed. 1996) ("Surplus lines insurance is often a source of last resort for the placement of liability or property insurance on unusual risks.").

In this matter, a surplus lines carrier issued a commercial-lines insurance policy for excess insurance coverage to a New Jersey insured. As then required by statute, the insurer used a policy form common to New Jersey commercial insurers.[1] The form contained a standard provision promising notice to the policy holder if the insurer intended not to renew the policy. However,

---

[1] At the time, the surplus lines law required such carriers to use policy forms approved by the Commissioner of Banking and Insurance (Commissioner) for the admitted market for the same line of insurance being written through surplus lines, a requirement that since has been deleted by amendment. *See N.J.S.A.* 17:22–6.42 and –6.43 as amended by *L.* 2003, *c.* 179, §§ 1–2.

in this dispute the insurer did not seek to initiate unilateral nonrenewal and had not provided the insured with notice of nonrenewal. Rather, when requested to do so, the insurer had provided a renewal price quote to which the insured neither responded nor submitted any payment. Nevertheless, because the standard policy form contained the nonrenewal notice provision, the question that has arisen is whether the surplus lines insurer must be held to *N.J.A.C.* 11:1–20.2(j)'s regulatory penalty of automatic renewal and the required continuation of post-term coverage for its non-paying insured. We conclude that the regulatory penalty has no applicability to a surplus lines insurer under the circumstances of this setting.

I.

The facts and procedural history to this insurance dispute may be summarized as follows. Plaintiff Piermount Iron Works, Inc. (Piermount) is a construction contractor. In need of excess liability insurance to enhance the coverage that was provided through its primary commercial liability insurance policy, Piermount sought an umbrella policy through the surplus lines market.

Toward that end, Piermount engaged the services of Morris Winograd Agency (Winograd), a retail insurance broker. Winograd turned to Insurex, Inc. (Insurex), an authorized surplus lines insurance broker that focused its efforts on securing a policy from Evanston Insurance Company (Evanston). In order to obtain the Evanston policy that ultimately would insure Piermount, Insurex contacted Burns & Wilcox, Ltd. (B & W), a surplus lines wholesaler licensed in New Jersey. In addition to being a surplus lines wholesaler, B & W also engages in business as Illinois RB Jones Company, the managing agent for Evanston. In that capacity, B & W solicits, receives, and accepts proposals for insurance contracts to be issued by Evanston. B & W wrote the contract for Evanston's initial umbrella policy covering Piermount for a period of one year, effective in March 2000, as well as for the renewal

policy, which took effect in March 2001. The coverage question in this matter arises under the terms of the 2001 policy.

The 2001 umbrella policy had a term of one year and, therefore, its expiration date was March 13, 2002. The policy also contained a provision stating:

> When We Do Not Renew.
>
> If we decide not to renew this policy, we will mail or deliver to the first named insured shown in the Declaration written notice of the non-renewal not less than 30 days before the expiration date or such other period as may be required by law.

It is undisputed that Evanston did not send a notice of renewal to Piermount.

That said, Winograd, which knew when the Evanston insurance policy was set to expire, submitted a renewal application to Evanston. The umbrella policy application represented that Piermount had secured effective primary insurance coverage with Lexington, a New Jersey domestic insurer, at a renewal quote of $32,000.[2] Winograd's renewal application was inaccurate, however. Lexington already had notified Piermont about an audit performed on Piermount's account, which revealed that Piermount was more than $90,000 in arrears on its premium payments. As a result, Lexington had refused Piermount a renewal-quote offer until the premium arrearage was paid. Thus, at the time Piermount submitted its application to Evanston, Winograd and Insurex had secured a thirty-day extension for Piermount's then-extent primary policy with Lexington. However, they had not yet received an offer from Lexington that it would write for Piermount a renewal policy to cover the time period pertinent to and required for the umbrella policy application to Evanston. That information, however, was not made known to Evanston.

On March 22, 2002, Evanston, responding to Winograd's renewal application, sent to Winograd's surplus lines broker Insurex a

---

[2] Because an umbrella policy provides coverage in excess to the insured's primary insurance coverage, an excess liability carrier obviously will consider it necessary for the insured to demonstrate the existence of an effective policy of primary insurance whose terms satisfy the excess insurer.

renewal price quote offering surplus lines coverage to Piermount. Evanston did not receive any response to that offer. Furthermore, neither Piermount nor its broker paid the renewal premium to Evanston.

On March 28, 2002, after the Evanston surplus lines excess liability policy expired, a construction accident occurred in which Jay Jacobs, an employee of Piermount, was injured. The accident occurred at a location managed by general contractor J.T. Magen & Company, Inc. (Magen). Jacobs prevailed in a lawsuit filed in New York against Magen. Subsequently, Magen successfully brought a claim for indemnification against Piermount. Magen wanted coverage as an additional insured from Lexington under Piermount's primary policy, and from Evanston under Piermount's excess policy. Evanston refused to pay, however, claiming that its coverage expired on March 13, 2002, and that Piermount failed to effectuate a renewal. Ultimately, the Jacobs case settled for $2 million. Lexington and Magen's liability insurer, Travelers, Inc. (Travelers), each paid half of that amount.

Piermount filed the instant action in New Jersey against Evanston, seeking a declaration of coverage under the umbrella liability policy. Travelers intervened, seeking reimbursement of the $1 million it had contributed to the Jacobs settlement. Piermount also sued the other parties to Piermount's efforts to secure its umbrella policy coverage from Evanston, including Winograd, Insurex, and B & W.[3]

After discovery was fully completed and cross-motions for summary judgment were filed, the trial court, relying on *Citta v. Camden Fire Ins. Assoc.,* 152 *N.J.Super.* 76, 78, 377 *A.*2d 779 (App.Div.1977), determined that Evanston had no duty to provide advance notice of an expiring policy or of a conditional nonrenewal of a policy. In reaching its conclusion, the court also noted

[3] From the record it appears that Piermount has settled its claims with all other participants involved in its efforts to secure the initial and renewal umbrella policy through the surplus lines carrier, Evanston.

Piermount's failure to pay the renewal premium despite Evanston's offer to renew. Therefore, the court granted summary judgment in favor of Evanston.

On appeal, the Appellate Division reversed and remanded for entry of an order granting summary judgment to Piermount on the issue of continued coverage due to lack of notice. *Piermount Iron Works, Inc. v. Evanston Ins. Co.*, 397 *N.J.Super.* 463, 476–77, 938 *A.*2d 134 (2007). The panel determined that a surplus lines carrier's voluntary inclusion of policy language mirroring the mandatory nonrenewal notice language used in domestic policies bound the surplus lines carrier to the duty voluntarily undertaken by that clause. *Id.* at 471–74, 938 *A.*2d 134. The panel explained that, even though Evanston would not normally be subject to the automatic renewal provision of *N.J.A.C.* 11:1–20.2(j) because it is a surplus lines carrier, its voluntary assumption of the duty to provide nonrenewal notice resulted in the application of that regulation. *Ibid.* Thus, the panel held that Evanston's coverage of Piermount renewed automatically due to lack of notice of nonrenewal.[4] *Id.* at 476, 938 *A.*2d 134.

We granted Evanston's petition for certification, 196 *N.J.* 86, 951 *A.*2d 1039 (2008), to review whether Piermount's surplus lines umbrella policy of excess commercial liability insurance with Evanston automatically renewed pursuant to *N.J.A.C.* 11:1–20.2(j) due to Evanston's failure to provide notice of nonrenewal to Piermount.

## II.

In New Jersey, the cancellation or nonrenewal of an insurance policy is strictly controlled by the Commissioner of the Department of Banking and Insurance. *See N.J.S.A.* 17:29C–1. The Commissioner is authorized

---

4 For completeness sake, we note that the panel remanded the matter for further proceedings on limited issues. *Id.* at 468, 938 *A.*2d 134.

to direct, by rule or regulation as hereinafter provided, that insurance companies organized under the laws of this State or organized to do business in this State, shall include provisions in policies of insurance written by any such company in this State, whereby 30 days' written notice shall be given; (1) to the insured, of the cancellation of any such policy; and, (2) to any designated mortgagee not named therein as the insured of the cancellation of any interest in such policy; and, (3) to the insured, of intent not to renew any such policy.

[*Ibid.*]

Pursuant to that statutory authority, the Commissioner issued regulations, one of which directs that "[n]o policy shall be nonrenewed upon its expiration date unless a valid written notice or nonrenewal has been mailed or delivered to the insured...." *N.J.A.C.* 11:1–20.2(a). The Commissioner further directed that "if an insurer fails to send a notice of nonrenewal as required ... the insured shall be entitled to continue the expiring policy at the same terms and premium until such time as the insurer shall send appropriate notice of termination or renewal." *N.J.A.C.* 11:1–20.2(j). In addition, insurers in New Jersey must include in their policies boilerplate language that advises insureds of the requirements for notification in respect of cancellation or nonrenewal of an insurance policy:

Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

[*N.J.A.C.* 11:1–20.3(a).]

New Jersey's strong policy in favor of protecting insurance consumers is apparent in the regulatory record that supports the nonrenewal regulations. The rule-making record created by the Commissioner at the time of the rule's adoption expresses the clear intention to combat unfair cancellations and the prevalence of nonrenewals in the commercial and homeowner's insurance markets. *See* 27 *N.J.R.* 4121(a)(Nov. 6, 2005). It is well understood that the purpose behind the requirement of continued coverage, through a period of automatic renewal when an insurer fails to give notice of termination or nonrenewal, is to avoid a lapse

in coverage for the want of a simple notice to the insured. *See Barbara Corp. v. Bob Maneely Ins. Agency,* 197 *N.J.Super.* 339, 484 *A.*2d 1292 (App.Div.1984), *appeal dismissed,* 102 *N.J.* 339, 508 *A.*2d 214 (1985); *see also Harvester Chem. Corp. v. Aetna Cas. & Sur. Co.,* 277 *N.J.Super.* 421, 432 n. 8, 649 *A.*2d 1296 (App.Div. 1994) (recognizing same), *certif. denied,* 139 *N.J.* 441, 655 *A.*2d 443 (1995). Notice allows the consumer to take protective action. It gives the insured "the opportunity to guard against the peril of noncoverage, a peril which ... can arise out of miscommunication among brokers, agents, insureds and carriers." *Echevarias v. Lopez,* 240 *N.J.Super.* 104, 108, 572 *A.*2d 671 (App.Div.1990).

Our strong public policy requiring notice of nonrenewal, and the concomitant obligation to continue coverage when an insurer fails to satisfy that notice requirement, has been made broadly applicable by the Commissioner. The regulatory requirements of *N.J.A.C.* 11:1–20.2 cover any authorized carrier in New Jersey writing a line of insurance made subject to those requirements. This case, however, concerns an insurance carrier in a different category. Surplus lines coverage has its own public policy considerations and its insurers have their own unique obligations to their policyholders. The Commissioner has declared Evanston an eligible surplus lines carrier. We therefore turn to examine the nature of that status and what it means in the context of this State's regulatory policy in respect of nonrenewal notice.

III.

Broadly stated, "[s]urplus lines insurance involves New Jersey risks which insurance companies authorized or admitted to do business in this State have refused to cover by reason of the nature of the risk." *R.R. Roofing & Bldg. Supply Co. v. Fin. Fire & Cas. Co.,* 85 *N.J.* 384, 389, 427 *A.*2d 66 (1981); *see also Howell v. Rosecliff Realty Co.,* 52 *N.J.* 313, 316, 245 *A.*2d 318 (1968) (noting Legislature's adoption in 1960 of surplus lines law permitting residents access to surplus lines coverage). New Jersey's surplus lines law authorizes the Commissioner to determine whether an

insurance coverage is eligible "for export", *see N.J.S.A.* 17:22–6.43, and to declare that an unauthorized insurer is eligible to receive New Jersey surplus lines insurance business, *see N.J.S.A.* 17:22–6.45, through specially licensed surplus lines agents, *see N.J.S.A.* 17:22–42.[5]

The State's reliance on the use of surplus lines agents to restrict an insured's access to unauthorized carriers has been the subject of previous discussion:

> The primary means adopted by the Legislature for regulating th[e surplus lines insurance] business is to require surplus lines insurers to conduct their business through surplus lines agents who are licensed by the State. *N.J.S.A.* 17:22–6.42(a). "New Jersey's requirement that surplus lines insurers receive all business through surplus lines agents represents a compromise affording New Jersey residents the in-state availability of this coverage when needed, while at the same time protecting state residents from direct solicitation by these relatively unregulated insurers." *Evanston Ins. Co., Inc. v. Merin,* 598 *F.Supp.* 1290, 1298 (D.N.J.1984). [*Indus. Dev. Assocs. v. Commercial Union Surplus Lines Ins. Co.,* 222 *N.J.Super.* 281, 288, 536 *A.*2d 787 (1988).]

For the most part, however, surplus lines insurers are relatively free from regulatory requirements otherwise imposed on authorized domestic insurers, *see N.J.S.A.* 17:17–1, or admitted foreign insurance companies, *see N.J.S.A.* 17:32–1. *See Evanston Ins., supra,* 598 *F.Supp.* at 1297–98 (detailing "lesser degree" of state insurance regulation imposed on surplus lines insurers compared to authorized or admitted carriers and commenting that "[the] special restriction on the manner in which surplus lines insurers may receive business in New Jersey corresponds to their relative-

---

[5] This regulatory scheme is common for surplus lines insurance. As described in 1 *Appleman on Insurance 2d* § 2.17,

> [Surplus lines risks] are generally risks that do not fall within the general parameters of traditional markets. Resort to the surplus market may also lie where the insured is unable to obtain insurance from admitted insurers within the state. Upon a showing that no such traditional coverage is available from admitted carriers, the insured may obtain the required coverage from non-admitted carriers....
>
> Each state licenses "surplus lines" agents and brokers to place business with insurance companies which are not admitted to that state when the business cannot be underwritten or placed with admitted insurers.

ly greater freedom from state regulation, as compared to admitted and authorized insurers").

Essentially, surplus lines insurance coverage may be accessed when "[t]he insurance coverage required [is] not ... procurable, after a diligent effort has been made to do so, from [an insurance company licensed in this state.]" *N.J.S.A.* 17:22–6.43(a). When that occurs, then "[t]he premium rate at which the coverage is exported shall not be lower than the lowest rate which has been filed by or on behalf of any [domestic] insurer." *N.J.S.A.* 17:22–6.43(b). For an unauthorized insurer to qualify to write a policy as a surplus lines insurer in this state, the carrier must apply to the Commissioner to become eligible, *N.J.S.A.* 17:22–6.45(a), and the application will be granted if the requirements of *N.J.S.A.* 17:22–6.45 are satisfied. Those requirements are both procedural and substantive in nature. *Ibid.* And, they are detailed. We therefore set them forth in full.

> (b) The insurer must be currently an authorized insurer in the state or country of its domicile as to the kind or kinds of insurance proposed to be so placed, and must have been such an insurer for not less than one full year preceding; or must be the subsidiary of an admitted insurer or of an already eligible surplus lines insurer that has been so admitted or eligible for a period of not less than one full year preceding;
>
> (c) Before [the commissioner may] grant [ ] eligibility the requesting surplus lines agent or the insurer shall furnish the commissioner with duly authenticated copies of its current annual financial statement, one in the language and monetary values of the country of the insurer, and the other in the English language and with all monetary values therein expressed in United States dollars, at the current exchange rate shown in the statement, and with such additional information relative to the insurer as the commissioner may require;
>
> (d) The insurer shall establish satisfactory evidence of financial integrity ...;
>
> (e) The condition or methods of operation of the insurer must not be such as would render its operation hazardous to the public or its policyholders in this State;
>
> (f) The insurer must be of good reputation as to the providing of service to its policyholders and the payment of losses and claims;
>
> (g) No insurer shall be eligible the management of which is found by the commissioner to be incompetent or untrustworthy, or so lacking in insurance company managerial experience as to make the proposed operation hazardous to the insurance-buying public; or which the commissioner has good reason to believe is affiliated directly or indirectly through ownership, control, reinsurance transactions or other insurance or business relations, with any person or persons whose

business operations are or have been detrimental to policyholders, stockholders, investors, creditors or to the public;

(h) No insurer shall be eligible the voting control or ownership of which is held in whole or substantial part by any government or governmental agency, or which is operated for or by any such government or agency . . .; and

(i) The insurer shall constitute, by a duly executed instrument filed with the department, the commissioner and his successor in office its true and lawful attorney, upon whom all original process in any action or legal proceeding against it may be served, and therein agree that any original process against it which may be served upon the commissioner shall be of the same force and validity as if served on the insurer, and that the authority thereof shall continue in force irrevocable so long as any liability of the insurer remains outstanding in this State. [*N.J.S.A.* 17:22-6.45(b)-(i).]

Despite that detail, the Commissioner's inquiry into a prospective surplus lines insurer is distinctly less rigorous than the examination that takes place for an authorized or admitted insurer. *See Evanston Ins., supra,* 598 *F.Supp.* at 1297–98 (comparing regulatory scrutiny imposed on surplus lines insurers with regulatory inquiry imposed on admitted or authorized insurers). In recognition that surplus lines insurers are willing to provide coverage in areas where authorized or admitted insurers are unwilling to take on the risk, the State places less onerous conditions on such carriers. The surplus lines statutory scheme reflects that policy choice. *See* Statement to Assembly Bill 2964, which became *L.* 2003, *c.* 179, deregulating policy forms in the surplus lines market "to increase the amounts of surplus lines insurance available in this State." Gen. Assem. 2964, 210th Leg., 2d Reg. Sess. (N.J.2003). Importantly, the Commissioner's regulatory policies contain other manifestations of the State's policy choice to impose less onerous demands on surplus lines carriers.

Pursuant to the nonrenewal regulation, specifically *N.J.A.C.* 11:1–20.1(a), the Commissioner has underscored the policy intention that surplus lines carriers are not to be treated the same as admitted or authorized insurance carriers. The regulation imposing the cancellation and nonrenewal notice requirement states in its opening provision that it shall not be applied to surplus lines policies. *Ibid.* Excluded from the scope of the cancellation and nonrenewal provisions of *N.J.A.C.* 11:1–20.2(a) are "workers' com-

pensation insurance, employers liability, fidelity, surety, performance and forgery bonds, ocean marine and aviation insurance and accident and health insurance and *any policy written by a surplus lines insurer.*" *Ibid.* (emphasis added).

According to the regulation's rule-making record at its original adoption, the surplus lines exemption was aimed specifically at assuring the continued availability of surplus lines coverage to fill the gap left by the risks that authorized or admitted carriers would not insure. *See* 17 *N.J.R.* 2915 (December 2, 1985) (stating, on emergency adoption of amendment to "the scope section of the regulation, *N.J.A.C.* 11:1–20.1" Commissioner's additional command "to exclude policies written by surplus lines insurers" in order that availability of coverage through surplus lines would not be exacerbated). The Commissioner was more concerned about not making our state an uninviting marketplace to write surplus lines risks than he was about the need for notice to an insured when an insurer was determining not to renew coverage for a particular commercial risk. The policy weighing has been done. The regulation's language could not have been clearer. Moreover, as we understand the policy's theory and purpose, it was reasonable and rational for the Commissioner to have determined against imposing a penalty of automatic renewal on a surplus carrier for its failure to provide notice of nonrenewal. Mandatory renewal of surplus lines coverage, as a penalty for notice failure, is inconsistent with the careful manner in which the Commissioner determines that surplus lines coverage is necessary and that a surplus lines carrier remains eligible. We find no basis in the regulation's language or rule-making history to support an extension of the regulatory penalty of automatic renewal to an expressly exempted surplus lines carrier.

Further, the fact that the policy at issue here did contain a provision informing the insured that notice of nonrenewal by the insurer would be provided does not alter our conclusion that the regulatory penalty of *N.J.A.C.* 11:1–20.2(j) should not apply to Evanston. As was noted earlier, at the time that this excess

policy was issued, surplus lines insurers were obliged to use the policy forms and contracts "approved by the commissioner for use in the admitted market for the same line or lines of insurance," which requirement has since been deleted by amendment. *See L.* 2003, *c.* 179 (deleting former *N.J.S.A.* 17:22–6.43(c)). That statutory amendment essentially deregulated the forms used by surplus lines insurers. *See N.J.S.A.* 17:22–6.42(f) ("Forms used by eligible surplus lines insurers ... shall not be subject to the insurance laws and regulations of this State."). We do not take Evanston's use of a common form approved for use in the commercial lines market, which included a notice of nonrenewal provision applicable to admitted and authorized commercial insurers, as evidence of an intent to subject itself to a regulatory scheme and penalty from which it was expressly exempt.

Moreover, that nonrenewal provision is immaterial when one considers what was occurring between these parties. Evanston apparently had no initial, unilateral unwillingness to write another excess policy for Piermount, as was evidenced by Evanston's willingness to respond to a request for a price quote. That said, the process by which surplus lines excess coverage for Piermount could be placed with Evanston through properly licensed agents and brokers was never consummated. No response to the quote was forthcoming from Piermount and no premium payment was ever made. In this setting, Piermount asks for a draconian remedy. It demands that a post-policy-term accident be covered by Evanston. Piermount wants Evanston held to the mandatory-coverage remedy provided by *N.J.A.C.* 11:1–20.2(j), asserting that, in order to end its coverage and not renew Piermount as an insured, Evanston had to have given notice. Because Evanston did not do so, Piermount argues that it is legally entitled to the benefit of an automatic renewal of its excess coverage through Evanston. We do not agree.

There is a lack of logic and equity to Piermount's demand. We decline to impose the regulatory penalty of *N.J.A.C.* 11:1–20.2(j) on circumstances that are foreign to the purpose and intention of

the regulatory requirement. That Evanston did not issue a notice of its own intention of being unwilling to issue a renewed surplus lines commercial insurance policy does not convert this expiring excess insurance policy into a perpetuating policy of insurance.

In sum, we hold that Evanston is not subject to the automatic renewal penalty in *N.J.A.C.* 11:1–20.2(j). Our holding respects the legislative and regulatory policy choice, generally through the surplus lines law, and specifically through *N.J.A.C.* 11:1–20.1(a), to exempt surplus lines carriers from the same regulations as admitted or authorized carriers, thereby helping to ensure that surplus lines coverage remains available in New Jersey. Our conclusion is further supported by the undisputed fact that the policy in dispute in this matter was issued prior to the 2003 amendment to *N.J.S.A.* 17:22–6.43(c). Thus, the policy was issued at a time when Evanston was required to use a standard policy form that contained, among its provisions, language reflecting a duty from which it was exempt. We conclude that the surplus lines insurer's use of a standard form commercial lines policy containing a nonrenewal provision did not demonstrate intent to submit voluntarily to this regulatory scheme with its automatic-renewal penalty provision.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for any further proceedings warranted and for entry of judgment consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and STERN (t/a)—5.

*Opposed*—None.