**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3358-22
A-3393-22

ATLANTIC CONCRETE CUTTING,
INC., and EVANSTON INSURANCE
COMPANY,

      Plaintiffs-Appellants,

v.

ZURICH AMERICAN INSURANCE
COMPANY, AMERICAN GUARANTEE
AND LIABILITY INSURANCE
COMPANY, ALLIANT INSURANCE
SERVICES, INC. and TRAVELERS
INDEMNITY COMPANY OF AMERICA,

      Defendants-Respondents.

_____

ATLANTIC CONCRETE CUTTING,
INC., and EVANSTON INSURANCE
COMPANY,

      Plaintiffs-Respondents,

v.

ZURICH AMERICAN INSURANCE
COMPANY and AMERICAN

GUARANTEE AND LIABILITY
INSURANCE COMPANY, and ALLIANT
INSURANCE SERVICES, INC.,

     Defendants-Respondents,

and

TRAVELERS INDEMNITY COMPANY
OF AMERICA,

     Defendant-Appellant.

_____

Argued April 29, 2025 – Decided March 31, 2026

Before Judges Gooden Brown and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0742-19.

Jonathan A. Cass argued the cause for Atlantic Concrete Cutting, Inc., appellant in A-3358-22 and respondent in A-3393-22 (Cohen, Seglias, Pallas, Greenhall & Furman, PC, attorneys; Johnathan A. Cass, on the joint briefs).

Edward M. Koch argued the cause for Evanston Insurance Company, appellant in A-3358-22 and respondent in A-3393-22 (White and Williams LLP, attorneys; Edward M. Koch and Matthew M. LaMonaca, on the joint briefs).

Frank E. Borowsky, Jr., argued the cause for Travelers Indemnity Company of America, appellant in A-3393-22 and respondent in A-3358-22 (Borowsky & Borowsky, LLC, attorneys; Frank E. Borowsky, Jr., on the briefs).

Patrick A. Florentino argued the cause for respondents Zurich American Insurance Company and American Guarantee and Liability Insurance Company (Coughlin Midlige & Garland, LLP, attorneys; Karen H. Moriarty and Patrick A. Florentino, on the briefs).

Matthew S. Marrone argued the cause for respondent Alliant Insurance Services, Inc. (Goldberg Segalla LLP, attorneys; Matthew S. Marrone, on the briefs).

The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

This appeal arises from a coverage dispute under a commercial "wrap-up insurance" program for injuries sustained in a construction site accident. "Wrap-up insurance" is a program of sweeping blanket insurance coverage that protects the owner, contractors, and tier subcontractors on a large construction project. 3 Hinshaw & Culbertson LLP & Kristina Alexander, California Insurance Law & Practice § 37.03 (2026). It is often referred to as a contractor-controlled insurance program (CCIP) or an owner-controlled insurance program (OCIP), depending on who has secured the coverage, and "can include general liability, builder's risk, workers' compensation, professional liability, excess, umbrella[,] and other specialized coverages." Ibid. Wrap-up insurance may reduce the overall cost of insurance on a project when compared to each participant

procuring its own insurance, and guarantees that all construction participants are insured, even those with insurability problems. Ibid.

In this appeal, the general contractor, Tutor Perini Building Corp. and Tutor Perini Corp. (collectively Tutor), was hired to construct a hotel in Philadelphia. Tutor retained subcontractor C. Abbonizio Contractors, Inc. (Abbonizio) to perform demolition of existing structures, excavation support, and underpinning. The contract included a term mandating Abbonizio's enrollment in a CCIP encompassing three insurance policies: a commercial general liability (CGL) policy and a workers' compensation policy issued by defendant Zurich American Company (Zurich), and an excess liability policy issued by defendant American Guarantee & Liability Insurance Company (AGLIC) (collectively Zurich unless individually named). The CCIP was managed and administered by defendant Alliant Insurance Services, Inc. (Alliant). Although Abbonizio was required to facilitate enrollment in the CCIP for its tier subcontractors, Tutor alone had the authority to designate and approve which tier subcontractors were CCIP eligible. The tier subcontractors had to apply to enroll in the program and then be accepted by Tutor to receive coverage under the three CCIP policies.

A-3358-22

In late June 2015, Abbonizio subcontracted portions of its work to plaintiff Atlantic Concrete Cutting, Inc. (Atlantic), whose first proposal included Atlantic's cost for its own insurance. In early July 2015, Tutor sent an email to Abbonizio, with copy to Atlantic, advising Abbonizio to facilitate Atlantic's CCIP enrollment and obtain a revised second proposal from Atlantic deducting its added insurance costs in light of the CCIP policies. Atlantic complied. Atlantic then sent its CCIP enrollment forms to Alliant and received a preprinted welcome letter signifying its CCIP enrollment as well as a separate certificate of insurance (COI) identifying the three CCIP policies.

Within hours, Tutor emailed Alliant declaring that Atlantic was ineligible and not permitted to enroll in the CCIP. Over the next few days, emails were exchanged between Tutor, Abbonizio, Alliant, and Atlantic indicating Atlantic had been enrolled in the CCIP policy in error because it was ineligible for CCIP enrollment since the scope of its work was demolition. Abbonizio forwarded emails to Atlantic from Tutor stating that before working on the project, Atlantic needed to revise its second proposal by adding back the costs of its own insurance. Atlantic complied and, without objection, submitted a third proposal and a COI showing its own CGL, excess, and workers' compensation policies.

Months later, in December 2015, Adam Hood, another subcontractor's employee, was injured on the site and sued Atlantic and others. Zurich and AGLIC denied Atlantic's request for defense and indemnification under the CCIP policies. Consequently, Atlantic and its own umbrella/excess insurer, plaintiff Evanston Insurance Company (Evanston) (collectively plaintiffs unless individually named), filed suit against Zurich, AGLIC, and Alliant, seeking declaratory judgment of CCIP coverage and indemnification of the costs and settlement expenses plaintiffs paid Hood. The Travelers Indemnity Company of America (Travelers), although named as a defendant, was substantively aligned with plaintiffs, as it was Atlantic's CGL insurer. Travelers, along with Evanston, defended Atlantic in the Hood lawsuit and paid the settlement.

All parties moved for summary judgment. The trial judge denied plaintiffs' and Travelers's motions, but granted Zurich's, AGLIC's, and Alliant's motions, dismissing the matter with prejudice. Plaintiffs and Travelers separately appealed, plaintiffs in A-3358-22 and Travelers in A-3393-22. In their appeals, they contend there were genuine issues of material fact as to whether Atlantic continued to be enrolled in the CCIP when Hood's accident occurred. They also assert the judge misapplied the law. We consolidate the appeals for purposes of issuing a single opinion and affirm.

I.

A.  The Construction Project and Parties.

We glean these facts from the motion record.  In 2015, Tutor served as the general contractor for the construction of the W/Element Hotel, a proposed fifty-two-story hotel located at 1441 Chestnut Street in downtown Philadelphia. Tutor is an Arizona corporation.  By subcontract agreement issued on April 16, 2015, and signed by both parties the first week in June 2015, Tutor retained subcontractor Abbonizio, a New Jersey corporation, to perform "[e]arthwork/support of excavation (SOE) and [u]nderpinning [work]" at the site.  The subcontract agreement described the scope of work but was "not intended to be all-inclusive or . . . limit[ing]."

The scope of work involved demolishing the existing foundations and installing new structural support before erection of the new building. Specifically, the agreement's "Exhibit 'A,'" entitled "SCOPE OF WORK: Earthwork/SOE/Underpinning Work," stated:

> A. GENERAL STANDARD ITEMS TO THE SCOPE
> OF WORK:
>
>     . . . .
> 2. [The s]ubcontractor acknowledges that the [c]ontractor has procured a . . . [CCIP] for this [p]roject. Prior to the commencement of any work on this [p]roject, [the s]ubcontractor agrees to submit all

A-3358-22

necessary enrollment forms in order to be accepted into the CCIP and to adhere to all rules, requirements and regulations of the CCIP, all as more fully set forth in the CCIP Insurance Procedures Manual and Schedule "B." Notwithstanding the CCIP [p]rogram, [the s]ubcontractor shall nevertheless be required to maintain certain coverages as specified in Schedule "B" and the CCIP Insurance Procedures Manual. [The s]ubcontractor represents it has familiarized itself with these provisions and shall fully comply therewith. Th[e s]ubcontractor certifies that the [s]ubcontract sum stated herein does not include costs for insurance coverages provided under the CCIP.

. . . .

B. SCOPE OF WORK TRADE RELATED ITEMS:

1. Provide all work including labor, material, accessories, equipment and supervision necessary to complete the [e]arthwork, [SOE], and [u]nderpinning . . . as more specifically defined in the following Specification Sections:

. . . Selective Demolition

. . . .

2. Site [d]emolition as indicated on the contract documents including but not limited to asphalt [and] concrete walks, curbs, fence, walls, bollards, lights [and] foundations, inlets, signage, wheel stops, street trees, guard rails, bike racks, and banner poles. [(Emphasis added).]

## B. CCIP Structure and Insurance Requirements.

A crucial amendment to the subcontract agreement, entitled "Attachment 3," established and detailed the CCIP and its insurance requirements. Attachment 3 also named Alliant as "CCIP Administrator" for the project and stated in pertinent part:

> 1. Contractor Controlled Insurance Program: Tutor[,] . . . also referred to herein as "Contractor," shall implement a [CCIP] . . . for the [p]roject. The CCIP is more fully described in the insurance manual . . . for the [p]roject, which is incorporated herein by this reference as a [c]ontract [d]ocument. Tutor . . . , has designated Alliant . . . as the CCIP Administrator ("CCIP Administrator") for the [p]roject. The CCIP will include [w]orkers' [c]ompensation and [e]mployer's [l]iability insurance, [CGL] insurance, and [e]xcess [l]iability insurance, as summarily described below, in connection with the [p]roject. The insurance provided under the CCIP shall be referred to herein as "CCIP Coverages."
>
> 2. Eligible and Enrolled Parties: Parties eligible to enroll in the CCIP are the Contractor, and [s]ubcontractors performing a portion of the [w]ork on the [p]roject site ("Eligible Parties"). Upon enrollment, an Eligible Party shall become an "Enrolled Party."
>
> 3. Excluded Parties: Parties that are not eligible to enroll in the CCIP, and who are excluded from the CCIP, are:
>
>> (a) Hazardous materials remediation, removal and/or transport companies and their consultants;

(b) Architects, surveyors, engineers, and soil testing engineers, and their consultants;

(c) Vendors, suppliers, fabricators, material dealers, truckers, haulers, drivers and others who merely transport, pick up, deliver, or carry materials, personnel, parts or equipment, or any other items or persons to or from the [p]roject site;

(d) Any [s]ubcontractor of any tier that does not perform any actual labor on the [p]roject site;

(e) Any other party or entity not specifically identified herein, that is excluded by Tutor . . . in its sole discretion, even if such party or entity is otherwise eligible.

4. Summary of CCIP Coverages: The policies shall be the primary source of information regarding the coverage afforded by the CCIP. The CCIP [c]overages shall apply only to those operations of each Enrolled Party performed at the [p]roject site in connection with the [w]ork, and only to Enrolled Parties that are eligible for the CCIP. CCIP [c]overages shall not apply to ineligible parties, even if they are erroneously enrolled in the CCIP.

[(Fourth, fifth, and seventh emphasis added) (emphasis omitted).]

Attachment 3 also obligated Abbonizio to, among other things: (1) "incorporate by reference the insurance requirements set out in . . . Attachment

10

3, into all of its lower tier subcontract agreements"; (2) "ensure that all of its lower tier [s]ubcontractors who are Eligible Parties enroll in the CCIP prior to their commencement of construction activities at the [p]roject"; and (3) "provide to each of its [s]ubcontractors of every tier a copy of . . . Attachment 3 and the [i]nsurance [m]anual."

Attachment 3 further stated that Abbonizio "shall acknowledge, and require all of its [s]ubcontractors of every tier to acknowledge in writing, that Tutor . . . and the CCIP Administrator are not agents, partners or guarantors of any CCIP insurer," and that Tutor "may, for any reason, modify the CCIP [c]overages, discontinue the CCIP, or request that any [s]ubcontractor of any tier withdraw from the CCIP upon thirty . . . days['] written notice."

As to "Cost of Work," Attachment 3 stated that "[e]ligible [s]ubcontractors (and each of its lower tier [s]ubcontractors) shall <u>exclude</u> from their bids all costs of insurance coverage provided under the CCIP (Cost of CCIP Coverages)." The "Cost of CCIP Coverages" was defined in Attachment 3 "as the amount of [a s]ubcontractor's reduction in insurance costs due to eligibility for the CCIP, and includes reduction in insurance premiums." By contrast, Attachment 3 stated that "Excluded Parties" had to provide all of their own insurance coverages for "both on-site and off-site activities," which included,

11

but was not limited to, workers' compensation insurance, CGL insurance, and umbrella/excess liability insurance. Excluded parties were required to deliver to Alliant the certificates of insurance evidencing those coverages prior to commencing work on the project.

Finally, Attachment 3 contained an "Order of Precedence" provision stating:

> In the event of a conflict between the provisions of this Schedule, the [i]nsurance [m]anual, and the provisions of the CCIP . . . policies, the terms of the CCIP . . . [p]olicies shall govern, then the provisions of this Attachment 3, then the provisions of the [i]nsurance [m]anual.

A CCIP Insurance Procedures Manual dated April 16, 2015 (CCIP Manual), was made part of the Tutor-Abbonizio subcontract agreement and expressly identified as one of the "Contract Documents." The CCIP Manual reiterated the conflict precedence order, stating in its introduction:

> The guidelines in this manual are to be used for informational purposes only. Any conflict between this document and any contract or subcontract, the contract or subcontract will govern. Any conflict between this manual and the actual CCIP policies, the policies will govern. Please refer to Attachment 3 for the order of precedence.
>
> [(Emphasis omitted).]

The CCIP Manual also stated its purpose was to describe the CCIP, identify the various parties' responsibilities, provide a basic description of the CCIP operation, describe audit and administration procedures, and provide answers to basic questions about the CCIP. The CCIP Manual did not provide "coverage interpretations," "complete information about [the] insurance policies affording coverage," or "answers to specific claims questions."

The CCIP Manual's "Overview" in Section 1.1 stated:

> Tutor . . . (Sponsor) has elected to use a [CCIP] . . . for the 1441 Chestnut Street [p]roject . . . . Under such a program, the Sponsor purchases certain insurance policies for protection of some (but not all) of the insurable risks that exist on a construction project. The insurance purchased by the Sponsor will be endorsed to extend coverage of the policy to any enrolled [s]ubcontractors. . . .
>
> Each bidder is required to exclude from their bid/subcontract price its Cost of CCIP Coverages.
>
> The CCIP provides the following insurance for all [s]ubcontractors, regardless of tier, who are eligible and approved for participation in the insurance program:
>
> • Commercial General
> • Workers' Compensation and Employer's Liability
> • Excess Liability
>
> Certain [s]ubcontractors are ineligible for this program. These parties are identified in the Definitions, Section 3.0 of this manual.

13

The Sponsor will pay all insurance premiums for the CCIP coverage listed above. Eligible and enrolled subcontractors should notify their insurer(s) of this program and delete from their insurance program charges and coverages for the on-site activities of this [p]roject that are covered under the CCIP.

Alliant, the CCIP . . . Administrator, will be administering the program on . . . behalf of the Sponsor.

[(Emphasis omitted and added).]

The CCIP Manual in Section 5.2, entitled "Enrollment," declared "[e]nrollment into the CCIP is required but not automatic." It provided:

Eligible [s]ubcontractors must complete the enrollment form online . . . and participate in the enrollment process for the CCIP coverage to apply. Access to the project site will not be permitted until the enrollment is complete.

Section 3.0, entitled "PROJECT DEFINITIONS," listed the following definitions applicable to the project and the CCIP Manual's descriptions of coverage:

[COI]:
A [d]ocument providing evidence of the existence of coverage for a particular insurance policy or policies.

. . . .

Contract:
A written agreement between the Sponsor and the [s]ubcontractor for specific work and also includes an

14

agreement between a [s]ubcontractor and any tier of [s]ubcontractor.

. . . .

Enrolled:
Eligible [s]ubcontractors and [s]ub-[s]ubcontractors that have submitted all necessary enrollment forms and documents, and have been accepted into the CCIP as evidenced by a [COI]. Also described in this manual as a [p]articipating [s]ubcontractor.

Ineligible:
Applies to [s]ubcontractors of any tier who are excluded from participation in the CCIP, including those involved in loading, transporting, and unloading materials, personnel, parts, or equipment, or any other items to, from or within the [s]ite.

Insured:
The Sponsor, [p]articipating [s]ubcontractors, and any other party so named in the insurance policy.

. . . .

Sponsor:
Tutor . . . .

[(Boldface and italicization omitted).]

The CCIP Manual's Sections 4.0, entitled "INSURANCE COVERAGE,"

and 4.1, entitled "Covered Parties," stated in part, that

[a s]ubcontractor or [s]ub-[s]ubcontractor shall not be deemed to be a [p]articipating [s]ubcontractor and shall not be permitted to work on the project until enrolled in the CCIP by the [p]rogram [a]dministrator. Enrollment

15

will be established only upon issuance by the [p]rogram [a]dministrator of a CCIP [COI] to the [p]articipating [s]ubcontractor.

[(Emphasis omitted).]

According to the CCIP Manual's Section 4.2, entitled "Parties Not Covered," the parties that were not covered by the CCIP included "all vendors, suppliers, truckers, material dealers, any contractors performing abatement or otherwise working with hazardous materials, and delivery services companies, regardless of contract size." These "[n]onparticipating [s]ubcontractors" of any tier would "not be permitted to work on the [p]roject" until they provided Alliant proof of their own certificates of insurance and endorsements. In addition, the CCIP Manual expressly stated: "Tutor . . . has the right to include or exclude ANY SUBCONTRACTOR of ANY tier from participating in the CCIP at their sole discretion."

Additionally, in Section 4.3, entitled "Evidence of CCIP Coverage," the CCIP Manual read:

> Each [p]articipating [s]ubcontractor will be issued a [w]orkers' [c]ompensation policy, including [e]mployer's [l]iability coverage. The CCIP [p]rogram [a]dministrator will also provide a [COI] evidencing [g]eneral [l]iability, and [e]xcess [l]iability insurance to each [p]articipating [s]ubcontractor, each of whom will be a named insured on the policy. Other documentation including forms, posting notices, if any, will be

16

furnished to each [p]articipating [s]ubcontractor. A complete copy of the [p]olicy will be furnished to an authorized representative of each [p]articipating [s]ubcontractor upon written request.

[(Emphasis omitted).]

As for CCIP termination or modification, the CCIP Manual stated in Section 4.4, entitled "CCIP Termination or Modification":

The Sponsor reserves the right to terminate or modify the CCIP or any portion thereof. If the Sponsor exercises this right, subcontractors will be provided with at least [thirty] days['] notice of cancellation. At its option, Sponsor may procure alternate coverage or may require the [s]ubcontractors to procure and maintain alternate insurance coverage. Sponsor shall identify the details and limits of such alternate insurance coverage to [c]ontractor with its written notice of CCIP [t]ermination. The form, limits of liability and cost of such insurance and the insurer issuing such insurance to [s]ubcontractors will be subject to Sponsor's approval.

Should coverage be cancelled by the insurer, [thirty] days['] written notice will be provided per the contract.

Initially, Zurich provided an insurance binder to Tutor for its proposed CCIP policies, which was entitled, "Zurich in North America [CCIP] Confirmation of bound program." The binder began by stating:

This binder expires on . . . 02/28/2014. This is a binder for insurance. This is not an insurance policy. Any coverage description shown may be an abbreviated title and does not indicate in-force coverage. Only the

17

policy itself provides coverage. This binder is not a part of and is not incorporated into the insurance policy. If there is any conflict between the coverage descriptions shown in this proposal and the actual insurance policy, the insurance policy prevails. The insurance policy supersedes this binder.

. . . .

Zurich has prepared this binder in response to your submission requesting insurance coverage for specific lines of business. This binder is based on all of the lines of insurance in your submission. In the event you subsequently request a proposal for lines of business that differs from a prior submission, Zurich reserves the right to review and revise the terms and pricing of this binder.

One of the binder's sections, entitled "COMMENTS/RESTRICTIONS/ QUOTE SUBJECT TO," provided in part:

Enrollment in the Workers' Compensation program automatically enrolls the subcontractor in the General Liability portion of the program. If a subcontractor is not enrolled in the Workers' Compensation program there will be no coverage provided under the General Liability program until such time as that subcontractor is specifically approved and endorsed onto the General Liability policy by the Zurich underwriter.

Another section of the binder, entitled "Schedule of Named Insureds," provided, in part:

UNLESS OTHERWISE ENDORSED ON THIS POLICY, NO COVERAGE WILL BE PROVIDED TO VENDORS, SUPPLIERS, MATERIAL DEALERS,

18

ABATEMENT CONTRACTORS, TEMPORARY LABOR SERVICES, <u>DEMOLITION</u>, OR OTHER HAZARDOUS WASTE REMOVAL CONTRACTORS <u>WHO VISIT</u>, MAKE DELIVERIES TO OR WORK TEMPORARILY AT THE PROJECT SITE(S).

[(Emphasis added).]

Zurich issued CGL Policy No. GLO 5819877-00 to Tutor, effective December 23, 2013 to December 23, 2018, with policy limits of $2 million for each occurrence and $4 million in the general aggregate. Tutor was listed as the "Named Insured" on the "COMMON POLICY DECLARATIONS" and "COVERAGE PART DECLARATIONS," and Alliant was listed as "Producer."

Notably, the CGL policy contained a "Sole Agent for Insureds" endorsement, which provided:

SOLE AGENT FOR INSUREDS

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

IT IS AGREED THAT THIS POLICY IS ISSUED AT THE DIRECTION OF THE FIRST NAMED INSURED, WHICH SHALL BE SOLELY RESPONSIBLE FOR THE PAYMENT OF PREMIUMS AND LOSSES UNDER THE DEDUCTIBLE AMOUNT AS OUTLINED IN THE POLICY AND SHALL HAVE OTHER POLICY

19

RIGHTS TO ACT ON BEHALF OF INSUREDS. THE INSUREDS HAVE ASSIGNED TO THE FIRST NAMED INSURED:

1. THE RIGHTS, TITLE, AND INTEREST TO RECEIVE ANY AND ALL RETURN OF PREMIUM, DIVIDENDS, DISCOUNTS OR OTHER ADJUSTMENTS; AND

2. THE RIGHT TO REQUEST CANCELLATION OF THE POLICY; AND

3. AUTHORIZATION TO ACT ON THEIR BEHALF AS RESPECTS [sic] CHANGES TO ANY PROVISIONS OF THIS INSURANCE POLICY.

WE CONSENT TO SUCH ASSIGNMENT OF RIGHTS, TITLE AND INTEREST.

OTHER TERMS

ALL OTHER TERMS AND CONDITIONS OF THE POLICY NOT CHANGED BY THE PROVISIONS OF THIS ENDORSEMENT CONTINUE TO APPLY AS CURRENTLY WRITTEN.

It was undisputed that Tutor, which paid the policy premiums, was the First Named Insured under this Sole Agent for Insureds endorsement.

Zurich's CGL policy also had a "Joint Defense – Wrap Up" endorsement, which provided:

A-3358-22

JOINT DEFENSE – WRAP UP

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

THE FOLLOWING IS ADDED TO SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS:

7. SEPARATION OF INSUREDS PART B. IS REPLACED WITH THE FOLLOWING:

B. SEPARATELY TO EACH INSURED AGAINST WHOM CLAIM IS MADE OR "SUIT" IS BROUGHT, HOWEVER;

(1) ABSENT AN ACTUAL CONFLICT OF INTEREST BETWEEN TWO INSUREDS, WE SHALL HAVE THE RIGHT TO RETAIN ONE COUNSEL TO DEFEND ALL SUCH INSUREDS IN A JOINT DEFENSE.

AN ACTUAL CONFLICT OF INTEREST SHALL BE DEEMED TO EXIST ONLY WHEN THE FOLLOWING CIRCUMSTANCES EXIST:

(A)[] AN INSURED AGAINST WHOM CLAIM IS MADE OR "SUIT" IS BROUGHT PERFORMED WORK OR FURNISHED MATERIALS, PARTS OR EQUIPMENT IN CONNECTION WITH SUCH WORK ON A SPECIFIC PORTION OF THE CONSTRUCTION

A-3358-22

PROJECT ON WHICH ANY OTHER INSURED ALSO PERFORMED WORK OR FURNISHED MATERIALS, PARTS OR EQUIPMENT IN CONNECTION WITH THAT SAME SPECIFIC PORTION OF THE CONSTRUCTION PROJECT; AND

(B)[] AN APPORTIONMENT OF RESPONSIBILITY WILL OCCUR BETWEEN THE INSUREDS FOR "BODILY INJURY" OR "PROPERTY DAMAGE" ALLEGED TO HAVE BEEN CONCURRENTLY, JOINTLY OR CONSECUTIVELY CAUSED IN CONNECTION WITH THAT SAME SPECIFIC PORTION OF THE CONSTRUCTION PROJECT.

(2) AN ACTUAL CONFLICT OF INTEREST MAY BE WAIVED BY THE INSURED IN WRITING.

Zurich's CGL policy also contained an endorsement entitled "COMMON POLICY CONDITIONS," which stated:

A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

22

a. [ten] days before the effective date of cancellation if we cancel for nonpayment of premium; or

b. [thirty] days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

[(Boldface omitted).]

The policy also had an endorsement entitled, "Earlier Notice of Cancellation or Non-Renewal," which raised the number of days required for a notice of cancellation "[f]or any statutorily permitted reason for cancellation other than nonpayment of premium" to ninety days.

Another COMMON POLICY CONDITION, "Changes," read:

B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

[(Boldface omitted).]

Zurich's CGL policy also had an endorsement entitled, "Named Insured – [CCIP]," that provided:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the:

Commercial General Liability Coverage Part

A. The following is added to Section II–Who Is An Insured:

1. Subject to Paragraph 2[] below, a contractor of any tier, including the person or organization designated in the Declarations of this policy will qualify as a Named Insured, if such contractor:

a. Is enrolled in the [CCIP] for which this policy is provided; and

24

b. Performs operations at a "designated project[."]

2. <u>Unless added by separate endorsement, the following are not an insured under this policy</u>:

a. Vendors, suppliers, material dealers, abatement contractors, <u>blasting contractors</u>, delivery persons, haulers, hazardous waste removal contractors;

b. Any person or organization that manufactures or fabricates products or components outside the "designated project" that does not also install the product or component at the "designated project"; or

c. Any contractor or other person or organization that does not have dedicated payroll for employees on-site at the "designated project[."]

B. For purposes of this endorsement, "designated project" is defined in the Limitation of Coverage to Designated Project(s) endorsement (U-GL-1305) attached to this Coverage Part.

All other terms and conditions of this policy remain unchanged.

[(Emphasis added).]

25

An endorsement entitled, "Additional Insured – Automatic – Owners, Lessees Or Contractors – Products-Completed Operations Liability Amendment," stated:

> This endorsement modifies insurance provided under the:
>
> Commercial General Liability Coverage Part
>
> A. Section II – Who is An Insured is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.
>
> However, if you have entered into a construction contract or construction agreement with an additional insured person or organization, the insurance afforded to such additional insured only applies to the extent permitted by law.
>
> [(Boldface omitted).]

In addition to these endorsements, Zurich's CCIP CGL policy contained endorsements that modified, among other items, the common policies for cancellation and nonrenewal for multi-state risks in California, Louisiana, Florida, and Texas, and an endorsement for railroad contracts. The policy and its related CCIP policies covered multiple projects in various states over the course of five years.

A-3358-22

AGLIC issued a "Straight Excess Liability Policy," No. SXS 5819649-00, to Tutor effective December 23, 2013, to December 23, 2018, with policy limits of $25 million per occurrence. The policy also included endorsements for cancellation and nonrenewal for policies in California.

### C. Atlantic's CCIP Enrollment and Exclusion.

On June 24, 2015, emails were exchanged between Anne Lorenz, Tutor's health risk manager, and her boss, Michelle Luster, about Abbonizio's work at the W/Element Hotel. Lorenz wrote: "Abbonizio is enrolled in the CCIP for their earthwork. Please confirm that you agree that a separate subcontract will have to be issued for the demolition work here designating them as an excluded party for this work." Luster responded, "Agreed. Based on the scope of work I read, this would be an excluded scope."

On June 26, 2015, Atlantic submitted its first proposal for concrete cutting services to Tutor, Proposal 106439 (Proposal One), with a contract price of $22,900. Proposal One described two types of proposed work: (1) one day for "[h]and sawing, chipping, and breaking" pockets of "concrete slab to expose steel reinforcement" (one person at $1,900 per day); and (2) six days for "[two] union laborers" "to complete wall sawing, hand sawing, chipping, and breaking 150' concrete wall at property line" at the adjacent Ritz Hotel property, to

27

include "'shaving' of vertical wall at 'high' spots to create clean edge at property line limits and flush cut wall sawing concrete slab overhang to match vertical wall limits." Jeffrey Boggs, Atlantic's project manager, explained that an encroaching retaining wall belonging to the next-door Ritz Hotel had been uncovered during excavation and needed to be removed.

On July 9, 2015, Jim Brown, Tutor's General Superintendent, sent an email to Peter Abbonizio and Boggs, advising Abbonizio to enroll Atlantic in the CCIP and have Atlantic revise its proposal, deducting the costs of its own insurance. On July 21, 2015, Abbonizio sent an email to Atlantic, requesting a status update on the revised proposal and providing Atlantic with the CCIP paperwork, including copies of Attachment 3 and the CCIP Manual. Later the same day, Atlantic sent Abbonizio its second proposal, Proposal 106846 (Proposal Two), with a contract price of $22,200, describing work identical to Proposal One, but reducing the prices charged per day by $100 for each job.

In a July 28, 2015 email, Abbonizio sent a "Notice of Subcontractor Award (Form F)" to Atlantic and Alliant to begin Atlantic's CCIP enrollment process. The bottom of Form F stated in a pre-printed note:

> Please Note: It is the responsibility of the [c]ontractor awarding [the s]ubcontract to ensure that their tier sub(s) fill out, maintain, and file all necessary Wrap-up Enrollment forms and insurance documentation with

28

the Wrap-up Administrator. No hired tier sub may commence work until they are properly enrolled into the Wrap-up program, as evidenced by a [COI] provided by the Wrap-up Administrator.

[(Emphasis omitted).]

The next day, July 29, 2015, Abbonizio issued to Atlantic a purchase order corresponding to the work and amount listed in the second proposal, which stated:

Description: SAW CUTTING

Scope: Daily rates for [s]aw cutting to expose steel reinforcement and breaking 150' concrete wall at property line of Ritz will include all union labor, equipment and materials to complete.

The purchase order generally described the three types of work to be performed by Atlantic as: (1) "Hand sawing, chipping [and] breaking [five] pockets x concrete slab to expose steel reinforcement"; (2) unspecified down time; and (3) shaving of the vertical wall "high" spots "to create [a] clean edge at [the] property line of [the] Ritz" and "flush cut wall sawing concrete slab overhang to match vertical wall limits."

The same day, July 29, 2015, Nancy Dimacale, an Atlantic employee, submitted to Alliant a "Contractor Enrollment Form (Form A)," which described

Atlantic's proposed work as "[c]oncrete construction." The form did not reference demolition. The bottom of Form A stated in a pre-printed note:

> Note: Tutor . . . reserves the right to determine who participates in the Wrap-Up Insurance Program. I agree that the following insurance charges will be added to my base bid if I am excluded from the Wrap-Up.

As required, Dimacale also prepared an "Alliant Insurance Cost Worksheet (Form B)," which described the proposed work under Workers' Compensation Classification Code 0654, a classification for "Concrete Const[ruction] NOC." Form B further detailed Atlantic's gross contract value as $24,590, which included its insurance costs added to a net contract value of $22,200.

In response, in a correspondence dated July 30, 2015, Dennis McGowan, Alliant's Program Administrator, sent Dimacale an auto-generated "Welcome Letter" with an attached COI confirming Atlantic's CCIP enrollment. The Welcome Letter stated:

> You may start work on site no earlier than: 08/03/2015.
>
> Your enrollment into the [CCIP] for your work performed under [c]ontract [n]umber 1441-103-04 has been completed. The attached insurance certificate is provided to evidence your coverage for Workers' Compensation, General Liability, and Excess/Umbrella while working at the 1441 Chestnut project site . . . .

The COI, dated July 30, 2015, identified Alliant as "producer," Atlantic as "insured" and "certificate holder," and Zurich and AGLIC as "insurer(s) affording coverage." The certificate also identified the three CCIP policies with the same policy numbers as Tutor's master policies. The COI further stated in pre-printed language:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS [COI] DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
>
> . . . .
>
> THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

31

Under the certificate's section entitled, "DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES," was printed:

> Coverage is limited to work performed at the Tutor . . . 1441 Chestnut . . . under contract 1441-103-04. <u>The [g]eneral and [u]mbrella limits and aggregates are shared by all enrolled contractors on this project</u>. An individual [w]orkers['] [c]omp[ensation] [p]olicy will be issued in the name of the enrolled contractor.
>
> [(Emphasis added).]

The certificate also provided an additional pre-printed cancellation requirement as follows:

> SHOULD ANY OF THE ABOVE[-]DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

Soon after receiving McGowan's email and attachments, Tutor's Lorenz emailed several people, including Atlantic's Boggs, Benjamin Faust, Alliant's CCIP Program Manager, and Peter Abbonizio, clarifying that Atlantic was not permitted to enroll in the CCIP. Lorenz's email stated:

> [I]f the Atlantic . . . work referred to below is the Ritz work then please note that since it involves structural demolition, Atlantic will not be able to enroll into the CCIP for that work. We cannot enroll subcontractors into the CCIP who are performing structural demolition.

A-3358-22

Thereafter, in an August 3, 2015 email, Dennis Mickeleit, Tutor's construction site manager, emailed Alliant's Faust that because Atlantic "is performing structural demo on the job, they shouldn't be enrolled." On the same day, Tutor's Mickeleit also emailed Abbonizio and provided additional documents related to the project requirements for the proposed work at the property line with the neighboring Ritz Hotel. "Exhibit []A[] . . . Scope of Work" addressed the work on the "Ritz Retaining Wall/One Story Structure/Dog Walk (trespass) Work," describing the work to be completed as "110 [linear feet] saw cutting as directed by [c]ontractor's superintendent" and "provide [four to six] test locations (chip out concrete structure to locate steel rebar) in accordance with Thornton Thomasetti['s] inspection services report[]."

Exhibit A further stated in Paragraph A.2. that "Subcontractor [Abbonizio] acknowledges that for the work of this [s]ubcontract, it is an excluded party under the . . . [CCIP] for this [p]roject," and was required to submit a COI providing its own insurance coverage "prior to the commencement of any work under this [s]ubcontract." Paragraph B.6. stated "Subcontractor [Abbonizio] acknowledges that Atlantic . . . is also an excluded party under the CCIP," which must "comply with all insurance requirements set forth in the CCIP [] Manual and Schedule 'B' as an excluded party."

33

Shortly after receiving Mickeleit's email and attachments, Peter Abbonizio forwarded them to Atlantic's Boggs, stating: "I just got this from [Tutor], you need to revise your [second] proposal and add for the insurance. Also[,] please make sure the insurance is in place before we start any work." Two days later, on August 5, 2015, Boggs emailed Peter Abbonizio, copying Michelle Morris, Atlantic's Controller, and submitted a third proposal, Proposal 107127 (Proposal Three), with a contract price of $22,900. Proposal Three essentially reverted back to the details of Proposal One by describing the same work and adding back Atlantic's insurance costs. In his email to Abbonizio, in which Morris was copied, Boggs said, "Attached is the updated proposal to reflect the change in CCIP status. I will confirm with my office that we have a COI to you for the work."

Later that same day, Atlantic's Morris responded to Boggs's email, copying Dimacale, and stating: "I am confused. Are we switching to a CCIP or they are (sic) removing us from it?" Moments later, Morris followed up with another email to Boggs, copied to Dimacale, stating, "Now I see that there is NO CCIP." In the same email, Morris requested Dimacale "to take care of [it]" and "if we filled out the CCIP forms, disregard and issue them a certificate and let [T.C. Irons, Atlantic's insurance broker] know that it has switched please. Very

34                                                                                      A-3358-22

important." Boggs immediately responded to Morris in an email copying Dimacale, stating: "The owners are excluding all structural foundation demolition work from their CCIP, which applies to our work this time." A few moments later, Boggs sent a separate email to Morris, copying Dimacale, explaining, "For clarification, eventually I anticipate work on this project that will be covered by the CCIP. It is just this contract with . . . Abbonizio that has been excluded."

On August 10, 2015, Atlantic's Dimacale sent an email to Alliant's McGowan, confirming: "Our work was excluded from the [project], please make any adjustments accordingly." Minutes later, McGowan sent an email to Jim Napoli, Tutor's preconstruction manager, asking Tutor to confirm that Atlantic had been "excluded" from the CCIP. Shortly thereafter, in an email between Tutor and Alliant, Tutor's Mickeleit confirmed that Atlantic was excluded from the CCIP because "they are structural demo (sic) and therefore not enrolled."

On the same date, McGowan sent an email to the Zurich Construction Wrap Up Team with the subject line "RE: Tutor Perini Corporation/1441 Chestnut/Atlantic Concrete Cutting, Inc./08.01.2015." In the email, McGowan told the Team, "Please cancel effective 08/01/2015." McGowan's email was in

35

reply to an earlier email that originally confirmed Atlantic's CCIP enrollment, effective August 1, 2015. As a result, Zurich prepared a Cancellation Endorsement, un-enrolling Atlantic from the CCIP workers' compensation policy effective August 1, 2015. Zurich sent a copy of the Cancellation Endorsement to the Pennsylvania Compensation Ratings Bureau on August 17, 2015. No copy was ever forwarded to Atlantic.

Based on these events, Alliant updated the "Enrollment Status Report[s]" it maintained and sent weekly to Tutor, covering the period July 28, 2015, to January 5, 2016. Specifically, in the August 10, 2015 report, Atlantic was listed as "enrolled," but then was listed as "excluded" in the August 13, 2015 report and all the reports thereafter, including the report dated December 15, 2015, which covered the date of the Hood accident.

On August 11, 2015, Joe Artale, Abbonizio's CFO, sent an email to Atlantic's Dimacale advising:

> Atlantic . . . must correct their [COI] for Tutor . . . and [Abbonizio]. You can mimic the attached certificate or have your insurance carrier review the CCIP [M]anual for the insurance requirements for contracts not covered under the CCIP.

The following day, August 12, 2015, Dimacale emailed Artale a copy of Atlantic's COI showing its three policies: (1) a CGL policy issued by Charter

Oak Fire Insurance Company,[1] effective January 28, 2015, to January 28, 2016; (2) a commercial excess/umbrella liability policy issued by Evanston on February 6, 2015, effective January 28, 2015, to January 28, 2016; and (3) a workers' compensation and employers liability policy issued by Travelers.

Kelli Hopkins, Atlantic's Human Resources and Payroll Coordinator, emailed Atlantic's insurance broker, T.C. Irons, on August 27, 2015, with "another COI request." Hopkins had been provided with certain COI requirements by Abbonizio, including the document identified as "Schedule 'A' to . . . [Abbonizio] Subcontract (Accompanying CCIP . . . Manual from Tutor . . .) [CCIP] and Insurance Requirements 1441 Chestnut W/Element Hotel Philadelphia, Pennsylvania."

On September 4, 2015, Kelsey Johnson, an accounting assistant at Atlantic, communicated with Alliant's McGowan advising:

> I am working on submitting payroll/OCIP (sic) for our contract with . . . Abbonizio on the 1441 Chestnut Street-W Hotel job, however it looks as though a COI is needed. I know a notice was sent to one of our other employees, Nancy Dimacale, however she no longer works here anymore so I would like to get all caught up. The contract is excluded from our enrolled contracts so I am unable to submit—please let me know

---

[1] The COI states that Atlantic's CGL provider was Charter Oak Fire Insurance Company. However, the parties do not dispute that the CGL policy was issued by Travelers and effective February 5, 2015.

what is needed so [that] I can submit this month's payroll.

McGowan responded later that day, advising that Atlantic's COI was "compliant," and that "[n]o payroll [was] required for 'excluded' contractors."

On the same date, Johnson separately emailed Tina Hughes, Abbonizio's payroll administrator, to let her know she was "in touch with someone from OCIP (sic) [Alliant] – our contract is excluded from being able to upload payroll for some reason." Johnson followed up on September 8, 2015, advising Hughes she "had gotten word about there being no OCIP (sic) required for this job[] (as per the other email [she] had sent)." Later, Johnson responded to Hughes's insistence that "it is a CCIP job" by advising that there was no CCIP reporting required because on the Alliant portal the Abbonizio-Atlantic "contract comes up as 'excluded'" and according to McGowan's communications, "no payroll is required for excluded contracts."

After receiving an email from Abbonizio, Johnson emailed Morris on September 23, 2015, requesting assistance with certain reports required for the project and advising, "I had found out that this isn't an OCIP (sic) reporting job either." On September 25, 2015, Morris received a letter from an unnamed sender at Abbonizio, referencing "Job Number 2014.003 W/Element Hotel," and stating without further explanation:

A-3358-22

Please find enclosed all [c]ontract [e]xhibits for the above referenced [p]roject.

Atlantic . . . , is CCIP [a]pproved.  For the above referenced [p]roject.

If you have any questions or concerns, do not hesitate to contact our office.

Morris confirmed in her deposition that Atlantic had worked on the project under other proposals and purchase work orders after July and August 2015. She explained that Atlantic did not have "a typical subcontract" with Abbonizio. Rather, they used proposals and purchase orders to contract for the work.

D.  The Accident and Subsequent Insurance Requirements.

On December 11, 2015, Adam Hood, an employee of another project subcontractor, Moretrench American Corp., was assisting with the installation of a large 5,850-pound steel beam when the beam swung from a track hoe operated by an Abbonizio employee and injured him.  Just prior to the beam's falling, Atlantic's owner, Nancy Walker, had approached the track hoe to greet the operator.  When the operator extended his hand to greet her, he accidentally struck the controls causing the beam to swing and fall on Hood, crushing his legs and trapping him between the beam and the ground.

Atlantic's Boggs testified in his deposition that on December 11, 2015, Atlantic's "employees were wire sawing a[n existing] concrete structure" on a

A-3358-22

different corner of the property from its prior work on the Ritz Hotel retaining wall, and that Art Swindell was Atlantic's wire saw operator on that day. The record includes an invoice for additional job tickets between Abbonizio and Atlantic for work during multiple days in December 2015, including the day of the Hood accident. According to those invoices, the December 11 work comprised of wire sawing.

In March 2017, Hood and his wife, Lori Hood, filed a civil action for personal injuries and punitive damages in the Philadelphia County Court of Common Pleas, Law Division, captioned <u>Adam Hood and Lori Hood v. Tutor Perini Building Corp., Tutor Perini Corp., C. Abbonizio Contractors, Inc. and Atlantic Concrete Cutting, Inc.</u>, No. 170301763. The complaint alleged Hood was injured due to Atlantic's negligence, among other things. In August 2018, Zurich disclaimed defense or indemnification coverage for Atlantic under the CCIP policies. Consequently, Atlantic's direct liability insurer, Travelers, defended Atlantic. The Hood lawsuit settled in November 2019 for a confidential sum. Travelers paid its primary limits of $1 million, and Evanston made a payment of $350,000 under its excess/umbrella policy.

Prior to the settlement, on April 8, 2019, Atlantic and Evanston filed a five-count complaint against Zurich, AGLIC, Alliant, and Travelers alleging

breach of contract against Zurich (count one), claims of promissory estoppel against Zurich and Alliant (counts two and three), and negligent misrepresentation and professional negligence against Alliant (count four). In count five, plaintiffs requested declaratory judgment against Zurich, AGLIC, and Travelers regarding Atlantic's right to defense and indemnity from Zurich and AGLIC as "an enrolled CCIP [insured] subcontractor," as well as reimbursement of counsel fees and costs incurred in this suit and the underlying Hood litigation. The complaint stated Travelers was "named as a nominal [d]efendant," but "has a similar interest in obtaining declaratory relief against Zurich and [AGLIC] as it has expended substantial sums for the defense and indemnification of . . . Atlantic[] in the Hood litigation."

Defendants filed answers, counterclaims, and crossclaims. On February 10, 2023, following discovery, the parties filed motions and cross-motions for summary judgment. After conducting oral argument, the judge denied plaintiffs' and Travelers's motions for summary judgment. However, the judge granted Zurich's and AGLIC's motions for summary judgment in a May 26, 2023 order. After initially reserving decision, the judge granted Alliant's motion for summary judgment in a June 1, 2023 order, effectively dismissing the entire complaint and all related claims with prejudice. On July 25, 2023, the judge

41

issued a written supplemental statement of reasons supporting his oral statement of reasons placed on the record on May 26, 2023.  These appeals followed.

II.

Our analysis begins with some established principles regarding our standard of review.  "[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court."  Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).  That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion.  R. 4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.  R. 4:46-2(c); see Brill, 142 N.J. at 540.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations reformatted).]

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'"  Grande v. Saint Clare's

42

Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). "A party opposing a motion for summary judgment may not rely on unsupported assertions in their pleadings or in their opposition to defeat the motion" but must instead "come forward with affirmative proof that 'the facts are not as the movant alleges.'" Zelnick v. Morristown-Beard Sch., 445 N.J. Super. 250, 260 (Law Div. 2015) (quoting Spiotta v. William H. Wilson, Inc., 72 N.J. Super. 572, 581 (App. Div. 1962)).

Where there is no material fact in dispute, "we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

Stated differently, summary judgment "should be granted, in particular, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986)).  As such, we must consider the essential elements of the causes of action alleged as well as the request for declaratory relief.

The causes of action at issue in these appeals are breach of contract, promissory estoppel, and negligence.  For a breach of contract claim,

> [o]ur law imposes on a plaintiff the burden to prove four elements:  first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]." Model Jury Charges (Civil), 4.10A, "The Contract Claim—Generally" (approved May 1998).
>
> [Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (all but first alteration in original) (citation reformatted).]

A promissory estoppel claim "is made up of four elements:  (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington, 194 N.J. 223, 253 (2008) (citing Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499 (App. Div. 2003)).

44

Turning to negligence, "[i]n order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements:  '(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages.'" Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008) (all but first alteration in original) (quoting Weinberg v. Dinger, 106 N.J. 469, 484 (1987)).  In the context of insurance intermediaries, because "[a]n insurance producer acts in a fiduciary capacity in the conduct of his or her insurance business," N.J.A.C. 11:17A-4.10, "[t]he fiduciary relationship gives rise to a duty owed by the broker to the client 'to exercise good faith and reasonable skill in advising insureds.'"  Aden v. Fortsh, 169 N.J. 64, 79 (2001) (quoting Weinisch v. Sawyer, 123 N.J. 333, 340 (1991)).

We apply these settled principles to the judge's grant of summary judgment in favor of defendants and dismissal of plaintiffs' and Travelers's breach of contract, promissory estoppel, and negligence claims.

III.

A.  Whether Atlantic Was Enrolled in the CCIP at the Time of the Accident.

Plaintiffs and Travelers (collectively, appellants) contend the judge erred by finding Atlantic was not enrolled in the CCIP and, therefore, not covered by the CCIP policies at the time of the Hood accident in December 2015.  They

45

argue there are genuine issues of material fact with respect to that finding sufficient to overturn the judge's grant of summary judgment to Zurich and AGLIC. We disagree.

In granting summary judgment dismissal of the declaratory judgment complaint, the judge analyzed the undisputed facts and applied the governing legal principles. In his oral statement of reasons,[2] the judge found "the facts here are largely undisputed by the parties." According to the judge, "the dispute here is what is the operation of law for these undisputed facts." The judge initially "focus[ed] on the contractual relationships." In so doing, the judge found Atlantic had "not demonstrated a contractual relationship" with the CCIP insurers, Zurich and AGLIC. Rather, it was "clear on the record" that Atlantic's "contractual relationship was a subcontract with Abbonizio," which was "expressly subject to the terms and conditions of a CCIP" established in the contract between Abbonizio and Tutor.

The judge explained the CCIP "gave the contractor[,] Tutor[,] . . . the sole ability to determine who was enrolled in it and who was not enrolled in it. In

---

[2] Prior to oral argument on May 26, 2023, the judge issued a tentative oral decision on the record which was incorporated into the May 26 and June 1, 2023 orders, and memorialized in the July 25, 2023 supplemental statement of reasons.

other words, what risks [were] underwritten as a part of that program and what risks [were] not underwritten as a part of that program." That role "was not delegable or delegated on Abbonizio and . . . Atlantic was bound by that." Further, according to the judge, Atlantic "[n]ever appl[ied] or pa[id] a premium to Zurich or AGLIC" and, therefore, "had no relationship with them." Because Atlantic had no contractual relationship with the CCIP insurers, the judge concluded Zurich and AGLIC had "no duty" to send any notice of cancellation to Atlantic.

Next, the judge found plaintiffs' "entire case" was "based on [an] enrollment where they got a [COI], a document that says" "[b]y its very terms" "it does not create a contractual relationship" and is "not enforceable." The judge stated "there is a difference between cancellation and nonenrollment," and there was "no question" Atlantic knew its CCIP policies "were canceled," as "[t]hey never had the coverage to begin with . . . because of the work they were doing." Stated differently, "they were never intended to be a risk that was underwritten by the CCIP."

The judge explained Atlantic was "involved in . . . [what] is considered demolition work, . . . this concrete cutting, [so] they can't participate in the CCIP" because "demolition work was not included." The judge noted

47

demolition work is "a lot more dangerous" and "is a type of risk that the contractor might not want to include and the contractor has that prerogative." Further, Atlantic "was on site on the day of the accident . . . [and] was involved in causing [the accident] . . . . That's undisputed." Consequently, the judge found Atlantic "would not have been allowed to step foot on the premises unless they had gotten their own insurance," which they procured.

In his later written "supplemental" statement of reasons, the judge noted "[n]either the parties nor the [c]ourt could locate any relevant published New Jersey cases interpreting wrap-up insurance programs, whether contractor- or owner-controlled." As evident from the record, the judge described a CCIP or OCIP as "an agreement in a large, multi-party construction project in which the general contractor or project owner provides an insurance program to various participants in the construction project covering a variety of risks relating to the project as set forth in the plan documents."[3]

---

[3] The judge also quoted definitions from leading insurance treatises. See Hille & Vespole, New Appleman New Jersey Insurance Law § 4.36 (2023); 3 Hinshaw & Culbertson LLP & Kristina Alexander, California Insurance Law & Practice § 37.03 (2023). In addition, the judge noted our Legislature has mentioned wrap-up insurance coverage in New Jersey's Educational Facilities Construction and Financing Act, N.J.S.A. 18A:7G-1 to -48. See L. 2000, c. 72, § 71 (July 18, 2000), amended by L. 2007, c. 137, § 43 (Aug. 6, 2007).

A-3358-22

At the outset, the judge found it "undisputed" that the CCIP did not insure all of the insurable risks that existed at the project, and that Tutor was the "First Named Insured" under the sole agent endorsement in Zurich's CCIP CGL policy. Also, based on the documents and deposition testimony produced, the judge determined Atlantic had been erroneously enrolled in the CCIP as of August 1, 2015, and it was "clear that the cancellation of Atlantic's CCIP coverage was effective ab initio." He concluded "as of August 5, 2015, all parties involved in the CCIP—including Atlantic—undoubtedly knew and understood that Atlantic was not enrolled in the CCIP."

The judge also found other events confirmed Atlantic's disenrollment from the CCIP. First, the "undisputed documents and testimony leave no doubt that months before the [Hood] [a]ccident, Atlantic was aware, confirmed to others on numerous occasions, and raised no objection to the fact[] that it was not enrolled in the CCIP." Second, Atlantic had "procured its own direct general liability insurance to cover its work at the [p]roject through its primary carrier, Travelers, and its excess carrier, Evanston." Third, and most importantly, "[a]t no point did Atlantic ever attempt to re-enroll in the CCIP." Thus, the judge concluded it was "undisputed" that well before the Hood accident, "Atlantic

knew and understood in early August 2015 that it was not enrolled in the CCIP for the [p]roject."

Next, the judge found "[t]he documentation and eyewitness testimony regarding Atlantic's work on the date of the [Hood] [a]ccident all unequivocally demonstrate that Atlantic was engaged in demolition work on the [p]roject–work that was clearly excluded from coverage under the CCIP." Finally, according to the judge, "[t]he parties agreed that New Jersey law applie[d] to the claims against Zurich," notwithstanding Alliant's motion in limine, later dismissed, asserting that Pennsylvania law applied to the action.

With those findings and conclusions as a backdrop, the judge then addressed the complaint's breach of contract and promissory estoppel claims. Rejecting the breach of contract claim, the judge reasoned summary judgment was appropriate because "no contract existed between Atlantic and either Zurich or AGLIC at the time of the [a]ccident." In support, the judge determined: (1) Tutor had the sole right to remove contractors from the CCIP; (2) Atlantic was notified that it had been disenrolled from the CCIP, acknowledged it was disenrolled, and did not thereafter object; and (3) the CCIP-related documents explicitly barred Atlantic's enrollment and confirmed that its enrollment was subject to Tutor's sole discretion.

Considering the CCIP-related documents, citing Certain Underwriters v. Illinois National Insurance Co., 99 F. Supp. 3d 400, 407 (S.D.N.Y. 2015), the judge explained CCIP documentation was relevant to determine whether a project subcontractor, such as Atlantic, was permitted and/or required to enroll in a wrap-up insurance program. In Certain Underwriters, the court held that the specific language of the OCIP manual in that case disproved any interpretation that the OCIP coverage was primary and exclusive "by permitting covered contractors and subcontractors to obtain other insurance for on-site risks at their own expense and by excluding certain parties entirely from OCIP." Ibid.

Upon reviewing the CCIP-related documents here, the judge found they "made it clear that there would be no coverage for subcontractors performing demolition work, such as Atlantic, and, in any event, enrollment was subject to Tutor['s] . . . sole discretion." The judge explained:

> The CCIP Contract's definition of "Excluded Parties" includes: "e. Any other party or entity not specifically identified herein, that is excluded by Tutor . . . in its sole discretion, even if such party or entity is otherwise eligible."

> Additionally, the CCIP Manual, Section 4.2 Parties Not Covered, states "Tutor . . . has the right to include or exclude ANY SUBCONTRACTOR for ANY tier from participating in the CCIP at their sole discretion."

. . . .

Also, the section of the CCIP [b]inder entitled "Schedule of Named Insureds" identifies types of work not eligible for enrollment. It states in relevant part that "NO COVERAGE WILL BE PROVIDED TO . . . DEMOLITION . . . AT THE PROJECT SITE(S)." Based on the demolition work Atlantic was contracted to perform and did perform at the [p]roject, including its work on the very day of the [a]ccident, Atlantic was ineligible for coverage under the CCIP.

Finally, Exhibit A – Scope of Work, included as part of the Project Requirements, notes in Entry B.6. that "Subcontractor acknowledges that Atlantic . . . is also an excluded party under the CCIP[,]" and must "comply with all insurance requirements set forth in the CCIP Insurance [] Manual and Schedule 'B' as an excluded party."

[(Third and fourth omission in original) (fourth and fifth alteration in original).]

After determining the CCIP-related documents gave Tutor the sole right to have any subcontractor or sub-subcontractor removed or excluded from the CCIP, the judge concluded "to the extent Atlantic was an insured under the CCIP [p]olicies for a very short window of time, Tutor . . . had the exclusive right, and exercised the right, to have Atlantic [dis]enrolled from the CCIP." He found "the language of the Sole Agent Endorsement is clear and unambiguous on its face," and all of the CCIP-related documents, including the CCIP contract and CCIP Manual, "made it clear that Tutor . . . had sole authority to unilaterally

52

include, not include, or remove subcontractors such as Atlantic from enrollment in the CCIP and cancel such subcontractor's enrollment in the CCIP." The judge continued, "the parties acted in conformity with this language, further demonstrating its clarity."

The judge then considered the fact that Kathleen Kelly, Zurich's corporate designee, had confirmed in her deposition testimony that the sole agent endorsement authorized Tutor "as the only entity allowed to [dis]enroll a subcontractor from the CCIP therefore cancelling insurance coverage with respect to that entity." That is, Kelly had

> likened it to a policyholder adding or removing vehicles to an automobile policy during the year: the policy remains in effect, only the scheduled vehicles change. Similarly, Tutor['s] . . . CCIP for the [p]roject remained in effect throughout the [p]roject, with Tutor . . . adding contractors and/or subcontractors as appropriate, depending upon their work and involvement in the [p]roject.

Critically, the judge also found:

> Atlantic is a sophisticated party that has performed demolition work for major development projects, such as the W Hotel in Philadelphia—where the plaintiff in the Hood action was injured—as well as the Hudson Yards revitalization project in New York City. Its statements and conduct demonstrate that it understood that the general contractor, Tutor . . . , had the right to include and exclude certain subcontractors and certain work from inclusion in the CCIP. The relevant

53

communications made clear that demolition work was not included under the CCIP, and the undisputed facts demonstrate that Atlantic was engaged to perform, and actually was performing, demolition work at the time of the [a]ccident. The erroneous forwarding of CCIP documents to Atlantic was immediately corrected by Tutor . . . and acknowledged by all parties, including Atlantic. Atlantic promptly obtained its own insurance coverage as a prerequisite to starting its work on the [p]roject. Based upon an objective, "reasonable expectations" standard, the record here, interpreted in the light most favorable to Atlantic, does not support a finding that Atlantic was confused, misle[]d, or trapped as an "unguarded consumer."

[(Quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 604 (2001)).]

Thus, the judge held "Atlantic is not entitled to the favorable contract interpretation that contra proferentum provides."

After recounting the chronology of events, the judge concluded the undisputed facts demonstrated that Atlantic was notified of its disenrollment from the CCIP, acknowledged it was disenrolled, and did not thereafter object. Critical to the judge was the fact that in response to Abbonizio's request to revise the prior proposal, Atlantic did not object to its disenrolled status and provided Abbonizio with Proposal Three, adding back insurance costs for Atlantic's work because of its exclusion from the CCIP. The judge explained:

On August 5, 2015, . . . Boggs told . . . Morris . . . that "the owners are excluding all structural foundation

54

demolition work from their CCIP[.]" . . . Boggs clarified seconds later for . . . Morris'[s] and . . . Dimacale's benefit that "this contract with . . . Abbonizio that has been excluded." Additionally, on August 11, 2015, Abbonizio's CFO advised . . . Dimacale that "Atlantic . . . must correct their [COI]" and "review the CCIP manual for the insurance requirements for contracts not covered under the CCIP." And on September 4, 2015, Dennis McGowan of Alliant notified Atlantic[,] "No payroll is required for 'excluded' contractors." If that were not enough, on September 23, 2015, . . . Johnson confirmed to . . . Morris that, with regard to the [p]roject, "this isn't an OCIP reporting job either."

Next, the judge found Atlantic was promptly disenrolled from the CCIP. He explained that Zurich had prepared a cancellation endorsement removing coverage for Atlantic under the CCIP, and Alliant's Enrollment Status Reports showed Atlantic was "excluded" and, therefore, disenrolled, beginning with the August 17, 2015 report[4] and all reports thereafter, including the time of the accident. Furthermore, in addition to revising its proposal for the third time to add back the cost of obtaining its own coverage, the judge found "various Atlantic employees throughout the company acknowledged in writing no less than nine times that its work at the [p]roject was not covered by the CCIP,"

---

[4] The judge's supplemental statement of reasons indicates Atlantic's exclusion was first reflected in the August 17, 2015 report. However, the record provided indicates Atlantic was first listed as "excluded" in the August 11, 2015 report.

including Morris, Boggs, Dimacale, and Johnson. Critically, the judge found "Atlantic never attempted to re-enroll in the CCIP at any point for any other work." Thus, the judge found the undisputed facts demonstrated that "Atlantic was not enrolled in the CCIP at the time of the [Hood a]ccident, that it understood and acknowledged the [dis]enrollment, and that it obtained the necessary insurance at its own expense from its own carriers, Travelers and Evanston[,] as a prerequisite to its work on the [p]roject."

In dismissing Atlantic's breach of contract and declaratory judgment claims, the judge concluded:

> It is undisputed that Atlantic had been erroneously enrolled in the CCIP and was immediately [dis]enrolled, that Atlantic understood that it had been erroneously enrolled and immediately [dis]enrolled from the CCIP, and that Atlantic acknowledged the [dis]enrollment and did not object to it. Moreover, the relevant CCIP documents explicitly precluded enrollment of contractors or subcontractors performing demolition work; therefore, . . . Atlantic was not permitted to enroll in the CCIP and was well aware of that fact. Further, even assuming arguendo that a contract could be found, there could be no breach of contract because Atlantic expressly authorized Tutor . . . to request cancellation and/or changes to the CCIP [p]olicies. Finally, Atlantic sustained no damages as it was fully defended and indemnified in the Hood [l]awsuit by its own insurers, Travelers and Evanston.

In rejecting the promissory estoppel claim, the judge reasoned it "is not supported by the facts or law because Zurich and AGLIC made no promises to Atlantic, and Atlantic's purported reliance was unreasonable." In that regard, the judge found Atlantic had failed to show facts demonstrating it actually relied on enrollment in the CCIP to its detriment. Instead, the judge found Atlantic understood it was not enrolled in the CCIP and obtained its own insurance for its work on the project.

The judge found "no evidence of a clear and definite promise between Atlantic and Zurich prior to the [Hood a]ccident. Therefore, there could be no expectation of reliance on such a promise." Further, "any reliance upon the Welcome Letter from Alliant confirming enrollment in the CCIP would have clearly been unreasonable because Atlantic was immediately notified it was being [dis]enrolled from, and was ineligible for, the CCIP later on the same day it received the Welcome Letter, and on numerous times thereafter." As a result, Atlantic submitted Proposal Three, which included its own insurance expense, in order to work on the project consistent with the requirements established by Tutor and, when the Hood lawsuit was filed, Atlantic immediately tendered its request for defense and indemnity to its direct carriers, Travelers and Evanston, not to Zurich and AGLIC. Finally, the judge determined Atlantic sustained no

57

damage for a promissory estoppel claim. According to the judge, Atlantic did not change its position resulting in "'definite and substantial detriment' because Atlantic knew it was not enrolled in the CCIP, it continued its work on the [p]roject[] and continued to be afforded coverage by Travelers and Evanston."

On appeal, plaintiffs argue the judge erred because: (1) Atlantic was enrolled in and covered by the CCIP at the time of the Hood accident, as evidenced by its receipt of the COI, the plain language in the CCIP and other documents, and the deposition testimony; and (2) demolition work was not grounds for a denial of enrollment and insurance coverage under the CCIP. Similarly, Travelers contends the judge erred: (1) by improperly allowing Zurich's delegation to third parties, Tutor, Alliant and/or Abbonizio, of its non-delegable cancellation notice obligations; and (2) by ignoring inferential extrinsic evidence that does not support its conclusions.

Based on our de novo review, we agree with the judge's decision. We are satisfied the CCIP documents and the exchanged communications present no genuine issue of material fact and result in the unavoidable conclusion that Atlantic was not an enrolled subcontractor in Tutor's CCIP at the time of the Hood accident. "[I]t is only genuine issues of fact and not simply issues created by self-contradictions of an opposing party that are intended to preclude resort

to the device of summary judgment." Mosior v. Ins. Co. of N. Am., 193 N.J. Super. 190, 195 (App. Div. 1984) (quoting Holifield v. Cities Serv. Tanker Corp., 421 F. Supp. 131, 136 (E.D. La. 1976), aff'd, 552 F.2d 367 (5th Cir. 1977)). "Material facts are those that have some bearing on the claims being advanced." Korostynski v. State, Div. of Gaming Enf't, 266 N.J. Super. 549, 555 (App. Div. 1993). "[D]isputes on minor points do not" defeat a motion for summary judgment. Gilbert v. Stewart, 247 N.J. 421, 442 (2021) (citing J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 210 (2019)).

"[A] 'genuine issue as to any material fact' requires more than just disputing 'facts which are immaterial or of an insubstantial nature, a mere scintilla, [f]anciful, frivolous, gauzy[,] or merely suspicious.'" In re Registrant R.S., 258 N.J. 58, 78-79 (2024) (second alteration in original) (quoting Brill, 142 N.J. at 529). Facts "that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although we generally view the facts with all legitimate inferences therefrom favoring the non-moving party, "the presence of cross-motions for summary judgment may tend to muddy that clear mandate." Penn Nat'l Ins. Co. v. Costa, 198 N.J. 229, 232 n.1 (2009). However, where the facts are undisputed, as here, it "obviate[s] any need to apply any presumptions favoring the non-moving party." Ibid.

More importantly, summary judgment must be granted where the facts are so "one-sided that one party must prevail as a matter of law." Brill, 142 N.J. at 540 (quoting Anderson, 477 U.S. at 251-52).

Here, the record unequivocally establishes that Tutor was the First Named Insured and had the sole discretion to have any tier subcontractor, including Atlantic, enrolled, disenrolled, or excluded from the CCIP at any time as an ineligible party. Furthermore, the relevant CCIP documents are clear that the CCIP will not apply to ineligible parties, even if they happened to be erroneously enrolled. Significantly, Atlantic received copies of these documents and was aware of the CCIP requirements and conditions.

Specifically, pursuant to Zurich's CGL policy's Sole Agent Endorsement, as the judge correctly found, Tutor was undisputedly the First Named Insured as it was the Named Insured on the declarations pages and paid the policy premiums. See Araya v. Farm Fam. Cas. Ins. Co., 353 N.J. Super. 203, 209 (App. Div. 2002) (recognizing "the singular importance of the Declarations Page as the best indicator of what an insured's reasonable expectations should be") (citing Lehrhoff v. Aetna Cas. & Sur. Co., 271 N.J. Super. 340, 346-47 (App. Div. 1994)). Any suggestion that Atlantic was the first named insured is therefore misguided.

Second, Attachment 3, an amendment to the Tutor-Abbonizio subcontract, defined excluded parties as "[a]ny other party or entity not specifically identified herein, that is excluded by Tutor . . . or its parent entity in its sole discretion, even if such party or entity is otherwise eligible."

Third, the CCIP Manual also listed various subcontractors who would not be covered, and expressly stated that Tutor "has the right to include or exclude ANY SUBCONTRACTOR of ANY tier from participating in the CCIP at their sole discretion."

Fourth, Attachment 3 and the CCIP Manual both contained an order of precedence, ordering that if any ambiguity existed, the terms of the policies shall govern, then Attachment 3, and then the CCIP Manual. Significantly, Attachment 3 declared the CCIP provided insurance for all subcontractors for any tier "who are eligible and approved for participation." (Emphasis added). Those subcontractors not approved or excluded by Tutor were required to procure their own insurance coverage and deliver to Alliant the COI evidencing the coverage prior to commencing work on the project. Critically, Attachment 3 also stated "CCIP Coverages shall not apply to ineligible parties, even if they are erroneously enrolled in the CCIP." Further, Attachment 3 required Abbonizio to send its subcontractors of any tier a copy of that document and the

A-3358-22

CCIP Manual, which Morris, Atlantic's controller, admitted receiving on July 21, 2015, prior to Atlantic beginning any work on the project.

Turning to the exchange of communications between the parties, the record establishes that within hours of Atlantic's receipt of documents indicating it was enrolled in the CCIP, it received successive emails stating it had been enrolled in error, was ineligible, and was excluded from the CCIP. Thereafter, as requested and without protest, Atlantic presented a third proposal to Abbonizio adding back its own costs for insurance coverage and later sent a copy of the COI evidencing those policies. By August 12, 2015, all parties, including Atlantic, knew Atlantic was not enrolled in the CCIP. Atlantic never objected to its disenrollment or requested CCIP enrollment anytime in the future.

To support its argument, Atlantic relies on the Welcome Letter and the CCIP COI it received from Alliant on July 30, 2015, identifying all three CCIP policies with periods from August 3, 2015, to December 23, 2018. However, Atlantic and Alliant received an email that same day from Tutor's Lorenz stating Atlantic was not permitted to enroll because its work involved structural demolition. Thereafter, after a torrent of emails, Atlantic sent Abbonizio Proposal Three adding back the costs for its own insurance coverage. In its accompanying email, Atlantic stated, "Attached is the updated proposal to

reflect the change in CCIP status. I will confirm with my office that we have a COI to you for the work." Subsequently, Atlantic sent Abbonizio a compliant COI with its own policies.

The record is abundantly clear that Tutor had the sole discretion to have any tier subcontractor enrolled or excluded from the CCIP at any time as an ineligible party, and that the CCIP would not apply to ineligible parties, even if they happened to be erroneously enrolled. Further, it is clear Atlantic was immediately informed and understood it was ineligible and disenrolled from the CCIP. Atlantic never objected or requested future CCIP enrollment, immediately amended its proposal by adding the cost of its own coverage, as requested, and sent a COI showing its own coverage from Travelers and Evanston as a prerequisite to commencing work on the project.

We acknowledge the Welcome Letter stated: "Your enrollment into the [CCIP] for your work performed under Contract Number 1441-103-04 has been completed. The attached insurance certificate is provided to evidence your coverage for Workers' Compensation, General Liability, and Excess/Umbrella while working at the 1441 Chestnut project site." We further acknowledge the certificate named Atlantic as "insured" and Zurich and AGLIC as "insurer(s) affording coverage."

A-3358-22

The CCIP Manual defines a COI as "[a d]ocument providing evidence of the existence of coverage for a particular insurance policy or policies." However, a COI does not create coverage as it "does not of itself create any contractual relationship between the [recipient] and the insurer." Wells v. Wilbur B. Driver Co., 121 N.J. Super. 185, 197 (Law. Div. 1972) (citing Kloidt v. Metro. Life Ins. Co., 18 N.J. Misc. 661 (Sup. Ct. 1939)). It is not an insurance policy.

Moreover, the Certificates of Insurance Act, N.J.S.A. 17:29A-54 to -62, defines a COI in N.J.S.A. 17:29A-55 as "a document or instrument, regardless of how titled or described, that is prepared or issued by an insurer or insurance producer as evidence of property or casualty insurance coverage." N.J.S.A. 17:29A-57 further states:

> A [COI] shall not be considered a policy of insurance and shall not affirmatively or negatively amend, extend, or alter the coverage afforded by the policy to which the [COI] makes reference. A [COI] shall not confer to any person new or additional rights beyond what the referenced policy of insurance expressly provides.

> [(Emphasis added).]

Here, any reliance on the Welcome Letter and the COI as evidence of Atlantic's continued enrollment is misplaced. Even if Atlantic was enrolled at one point, the plain language in the CCIP documents, including its related

A-3358-22

insurance policies, unequivocally establish that Tutor had the sole discretion to reject any tier subcontractor's CCIP application as an ineligible party. The documents make it clear that the CCIP will not apply to ineligible parties, even if they happened to be erroneously enrolled.

Next, plaintiffs argue that an internal email from Tutor dated July 31, 2015, confirmed Atlantic's CCIP enrollment was complete, and that even Randi Vogt, Zurich's Customer Service Team Leader, concluded in her deposition that Atlantic was enrolled when she looked at the Enrollment Status Reports and Wrap-Up list Alliant maintained and sent weekly to Tutor.

Any reliance on the CCIP Enrollment Status Reports and Wrap-Up list as evidence of Atlantic's enrollment is misplaced. The CCIP documents require CCIP subcontractors to be eligible and approved. The documents state the CCIP will not apply to ineligible parties, even if erroneously enrolled. It is undisputed that Tutor did not approve Atlantic's enrollment and thereafter excluded it from CCIP participation. Further, all CCIP Enrollment Status Reports from August 11, 2015, show Atlantic as "excluded." The CCIP specifically states that "[a]ny contractor . . . that does not have dedicated payroll for employees on-site" is not an insured "[u]nless added by separate endorsement." Atlantic was never added

by separate endorsement and never submitted any dedicated payroll for its employees at the project.

Plaintiffs also argue the plain language in the CCIP documents, which they contend should be construed in an insured's favor and against the insurer, supports Atlantic's continued CCIP enrollment through December 2015. They point to the language ignored by the judge in Zurich's CCIP policy's "Named Insured – [CCIP] Endorsement," which defines "named insureds" as contractors "enrolled" in the CCIP and performing at a "designated project." They also refer to the CCIP Manual, which defines "enrolled" contractors as "[e]ligible [s]ubcontractors and [s]ub-[s]ubcontractors that have submitted all necessary enrollment forms and documents, and have been accepted into the CCIP as evidenced by a [COI]," and excludes only "vendors, suppliers, truckers, material dealers, any contractors performing abatement or otherwise working with hazardous materials, and delivery services companies."

Our courts generally construe any ambiguity in an insurance policy in favor of the insured under the doctrine of contra proferentem. Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co., 229 N.J. 196, 208 (2017). "Sophisticated commercial insureds, however, do not receive the benefit of having contractual ambiguities construed against the insurer." Ibid. "Contra

A-3358-22

proferentem is a consumer-protective doctrine 'only available in situations where the parties have unequal bargaining power. If both parties are equally . . . sophisticated, contra proferentem is inappropriate." Ibid. (quoting Pacifico v. Pacifico, 190 N.J. 258, 268 (2007)).

Guided by these principles, we agree with the judge's assertion that any application of the doctrine of contra proferentem is inappropriate here. Furthermore, the language relied on by plaintiffs creates no ambiguity or conflict, as it must be read together with the other CCIP documents.

Contract interpretation is a question of law reviewed de novo. Kieffer v. Best Buy, 205 N.J. 213, 222 (2011); see, e.g., Rodriguez v. Shelbourne Spring, LLC, 259 N.J. 385, 395 (2024) ("We interpret the insurance policy terms de novo."); Motil v. Wausau Underwriters Ins. Co., 478 N.J. Super. 328, 336 (App. Div.) ("It is well-settled that we review a court's interpretation of an insurance contract de novo."), leave to appeal denied, 258 N.J. 155 (2024). The document must be read "as a whole in a fair and common sense manner." Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009).

"It is well-settled that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" In re Cnty. of Atlantic, 230 N.J. 237, 254

(2017) (alteration in original) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)) (internal quotation marks omitted). "[W]here [an] agreement is evidenced by more than one writing, all of them are to be read together and construed as one contract, and all the writings executed at the same time and relating to the same subject-matter are admissible in evidence." Lawrence v. Tandy & Allen, Inc., 14 N.J. 1, 7 (1953) (quoting Gould v. Magnolia Metal Co., 69 N.E. 896, 898 (Ill. 1904)).

"A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting Barco Urb. Renewal Corp. v. Hous. Auth., 674 F.2d 1001, 1009 (3d Cir. 1982)). "[W]here several writings are made as part of one transaction, relating to the same subject matter, they may be read together as one instrument, and the recitals in one may be explained, amplified or limited by reference to the other — the one draws contractual sustenance from the other." Schlossman's, Inc. v. Radcliffe, 3 N.J. 430, 435 (1950).

Attachment 3 to the Tutor-Abbonizio subcontract makes the CCIP Manual a "Contract Document" and states that the CCIP "will include" the three insurance policies. It also states that "CCIP Coverages shall not apply to ineligible parties, even if they are erroneously enrolled in the CCIP," and gives

Tutor "sole discretion" to exclude any tier subcontractor from the CCIP "even if such party or entity is otherwise eligible."

The CCIP Manual further states that the CCIP provides insurance for all subcontractors, "who are eligible and approved for participation," and that Tutor "has the right to include or exclude ANY SUBCONTRACTOR of ANY tier from participating in the CCIP at their sole discretion." (Emphasis omitted). Reading those documents together with the policy recitals cited by plaintiffs, and considering that Atlantic knew it was disenrolled, excluded, and ineligible, we conclude plaintiffs' argument that Atlantic was continuously enrolled through December 2015 is baseless.

Plaintiffs assert Abbonizio's recognition of Atlantic's CCIP enrollment in a letter dated September 25, 2015, is critical. The letter acknowledged that "Atlantic . . . is CCIP [a]pproved. For the above referenced [W/Element Hotel] Project (sic)." Plaintiffs claim there is no documentary evidence showing Atlantic was notified of any disenrollment from the CCIP after the September 25 date.

The September 25, 2015 letter was unsigned and seemingly sent by Abbonizio. Because Abbonizio had no authority to enroll or disenroll any subcontractor, the letter could not have meant that Atlantic was enrolled in the

CCIP. Based on the undisputed evidence, only Tutor had the authority to enroll, disenroll, and exclude any tier subcontractor in the CCIP, and Tutor unquestionably excluded Atlantic and deemed it ineligible well before September 25, 2015. Atlantic accepted that decision without objection. Thus, the September 25 letter from Abbonizio is neither material nor sufficiently substantial in nature to avoid summary judgment.

Plaintiffs argue the judge erred by finding demolition work was grounds for a denial of CCIP eligibility and coverage under the CCIP policies. They claim the facts unequivocally prove Atlantic's "Work description: Concrete cutting," as described on its contractor enrollment form, is not demolition. They further refer to the deposition testimonies of Atlantic's Boggs and Swindell. In support of their argument, they point to Boggs's testimony that although "saw cutting would be considered incidental demolition work," Atlantic only performed concrete cutting.[5] They also rebut Swindell's testimony that he was "cutting with a[n] electric wire saw to demo[lish] concrete north face – wall north face (sic)" on the day of the Hood accident by asserting it was for "higher

---

[5] In the same deposition, Boggs explained that Atlantic also performed saw cutting work by stating: "I mean, that's what Atlantic . . . does. They saw cut concrete."

contractors" to designate whether Atlantic's saw cutting constituted demolition work or another category of work for insurance purposes.[6]

Plaintiffs further argue there was no explicit coverage exclusion for demolition work in the CCIP policies or the CCIP Manual. They point out the only exclusion for demolition is found in a CCIP binder submitted to Alliant, which expired in February 2014 and was replaced with the CCIP policies. Next, plaintiffs claim that while Atlantic's initial work in early August could be considered demolition, it understood that any subsequent jobs at the site would be enrolled in the CCIP. They rely on various emails, including ones from Tutor's Lorenz, who wanted to keep all of Atlantic's work "separate," and from Boggs, who said on August 5, 2015, that he "anticipate[d] work on this project . . . will be covered by the CCIP. It is just this contract with . . . Abbonizio that ha[d] been excluded." They argue that in fact, Atlantic was not performing

---

[6] In her deposition, Morris testified Atlantic "cut[s] concrete and asphalt and even steel . . . . And [Atlantic] do[es] wire sawing, wall sawing . . . and seal and slab sawing on the roadways. [Atlantic] do[es] green sawing . . . on freshly poured concrete. And core drilling . . . so that you can run the wire through whatever you're cutting." She also testified Atlantic does not determine whether its work would be considered demolition or covered under the CCIP, and instead "[i]t would be something that the contractor would tell [them]." Boggs testified, "Swindell[] was . . . the only employee doing concrete cutting on the day of the accident." Swindell, Atlantic's laborer, was deposed in the Hood lawsuit and confirmed Boggs's testimony.

A-3358-22

ineligible demolition on the day of Hood's accident, and they rely on documentary evidence describing the work that day as "core drilling" and "wire sawing." Critical to their argument is Abbonizio's letter to Atlantic dated September 25, 2015, which they argue established that despite any prior excluded work, Atlantic remained "CCIP [a]pproved" going forward and was entitled to rely on this guarantee.

We acknowledge the record shows Atlantic had anticipated conducting other work on the project after its July proposals. Atlantic's Morris confirmed Atlantic was working on the project under subsequent proposals and purchase work orders. She explained that Atlantic did not have "a typical subcontract" with Abbonizio and instead they used proposals and purchase orders to contract for the work. In fact, the record includes an invoice for additional job tickets between Abbonizio and Atlantic for work during multiple days in December 2015.

Nevertheless, we reject plaintiffs' contention the judge erred by finding demolition work was grounds for a denial of coverage under the CCIP policies. The record contains no CCIP enrollment request or CCIP enrollment documents for the work referenced in those later invoices or any related communications between Atlantic and Tutor, Abbonizio, Alliant or the CCIP insurers

72

establishing Atlantic was enrolled in the CCIP.  Rather, Atlantic never objected after Tutor disenrolled Atlantic and found its work ineligible in the summer of 2015.

As the judge correctly found, Tutor had sole discretion to exclude or include any subcontractor of any tier at any time and for any reason.  Attachment 3 to the Tutor-Abbonizio subcontract gave Tutor "sole discretion" to exclude any tier subcontractor from the CCIP "even if such party or entity is otherwise eligible."  The CCIP Manual further states Tutor "has the right to include or exclude ANY SUBCONTRACTOR of ANY tier from participating in the CCIP at their sole discretion."  (Emphasis omitted).  Therefore, plaintiffs' arguments fail.

B.  Notice Requirements and Applicability of Insurance Cancellation Laws.

Because it is undisputed that Zurich and AGLIC never advised Atlantic of the coverage cancellation or termination of the CCIP CGL and excess policies, Travelers contends the judge erred by improperly indulging Zurich's delegation of its non-delegable notice obligations.  Travelers asserts Atlantic was still covered by those policies at the time of the Hood accident because notice obligations for coverage cancellation rest on the insurer, not on Tutor, Alliant, or Abbonizio.

In support, Travelers cites Barbara Corp. v. Bob Maneely Ins. Agency, 197 N.J. Super. 339 (App. Div. 1984). There, we held notice of renewal obligations for a fire policy were not delegable and rested on "the insurer, not the broker or agent," and if the insurer failed to meet its obligations, then the policy is deemed automatically renewed. Id. at 346. However, Barbara is inapposite. "The point of Barbara is that an insured has the right to expect receipt of a notice from his insurance company regarding the imminent expiration of his casualty insurance so that he can protect himself and avoid a lapse in coverage." Insinga v. Hegedus, 231 N.J. Super. 562, 566 (App. Div. 1989). The Barbara court "did not intend to hold that if the broker did send an effective, proper[,] and timely notice, the insurer would be deprived of the benefit itself." Ibid. "[T]he nondelegability to which we referred in Barbara is a nondelegability of responsibility for performance, not nondelegability of the performance itself." Ibid.

Here, even if Zurich could not delegate its responsibility under the policies and/or regulations for notifying Atlantic of its CCIP coverage cancellation, the email exchanges between Tutor, Alliant, Abbonizio, and Atlantic informing Atlantic of its CCIP ineligibility and disenrollment were sufficient to notify Atlantic it was not covered by the CCIP policies. When notified of CCIP

74

ineligibility and disenrollment, without objection, Atlantic submitted its third proposal adding in the costs of its own insurance and acknowledged in the accompanying email "the change in CCIP status."

Travelers contends the judge erred because the evidence he relied upon as showing Atlantic had notice and knowledge that its CCIP policies were cancelled or terminated does not support that conclusion in light of other conflicting evidence in the record. According to Travelers, even if the email exchanges in the summer of 2015 put Atlantic on "substituted notice" that it was no longer enrolled in the CCIP, those communications do not support, as a matter of law, the judge's final decisions denying Travelers's summary judgment motion and granting Zurich's and AGLIC's motions.

Specifically, Travelers asserts despite the emails canceling Atlantic's CCIP workers' compensation policy, Atlantic did not know its CCIP liability and excess policies were also automatically cancelled when it was disenrolled. According to Travelers, the following facts show that Atlantic was still enrolled in Zurich's CCIP CGL policy and AGLIC's CCIP excess policy at the time of the Hood accident: (1) Abbonizio's September 25, 2015 communication confirming that Atlantic is "CCIP [a]pproved" for later work on the project; (2) deposition testimony from Atlantic's representatives that they believed Atlantic

was covered for this subsequent work; (3) deposition testimony that CCIP disenrollments are a rarity and that Tutor did not have any formal disenrollment process; and (4) testimony that contractors were occasionally enrolled for some work, but not for other work on the same project.

Travelers further asserts the lack of certain evidence demonstrates Atlantic had no knowledge that its CCIP liability policies had been cancelled. It argues, for example, there is no language in Zurich's policy that links the availability of coverage to an insured's status under the CCIP's workers' compensation policy. This conclusion, Travelers argues, is compounded by the fact that: (1) even though Zurich sent a notice of cancellation of Atlantic's workers' compensation policy to the Pennsylvania Workers Compensation Bureau, it never sent a copy of that endorsement to Atlantic despite knowing Atlantic's address; and (2) after initially determining that it could not decline Atlantic's tender of coverage under the CGL policy for the Hood lawsuit, Zurich thereafter took over one year to disclaim coverage to Atlantic. In addition, Travelers claims the judge erred by relying on the fact that Atlantic obtained its Travelers and Evanston policies after its enrollment was cancelled, when the actual fact is that both policies had been issued to Atlantic at least six months before it even applied for CCIP enrollment.

A-3358-22

We reject Travelers's arguments. It is undisputed Atlantic had received Attachment 3 and the CCIP Manual from Abbonizio, and both documents declared that the CCIP for participating subcontractors consisted of the three insurance policies. Thus, when Atlantic received the emails stating it was ineligible for any CCIP enrollment, Atlantic had to have known it was also not entitled to coverage under any of the CCIP policies. Zurich's Kelly testified once a subcontractor was enrolled in one CCIP policy, it was automatically enrolled in the other CCIP policies, and the same held true for cancellations.

More importantly, when told it was ineligible for CCIP enrollment and needed to obtain its own coverages before working on the project, Atlantic amended its second proposal to add the costs of its own insurance, which included a CGL policy from Travelers and an excess policy from Evanston. Atlantic then stated in its accompanying email, "Attached is the updated proposal to reflect the change in CCIP status," and later sent a COI showing its own policies. Although there were subsequent job invoices in the record, there is no evidence Atlantic ever requested or was offered CCIP enrollment for that work. Thus, the evidence cited by Travelers presents no genuine issue of material fact disavowing Atlantic's knowledge that it was not entitled to CCIP insurance coverage at any time.

Travelers asserts any reliance on the actual CCIP-related documents is misplaced as they are immaterial and unrelated to Zurich's obligations. It argues neither the Named Insured endorsement nor any of the enumerated exclusions in Zurich's CGL policy mention "demolition" or "demolition operations" as an exclusion to the CCIP or its insurance policies, and any reliance on the binder's exclusion for demolition work is misplaced as binders are only effective until the formal policy of insurance is issued.

"A 'binder' is a temporary policy of insurance, in force until it expires, either by its own terms, by replacement by a permanent policy of insurance, or rejection." Miney v. Baum, 170 N.J. Super. 282, 286 (Law Div. 1979); see N.J.S.A. 17:22-6.41(f) (a "'binder' . . . means temporary evidence of insurance, to be replaced by a policy or [COI]").

We acknowledge that reliance on the demolition exclusion in the binder is legally incorrect. However, the binder is not relevant to whether Atlantic's work was, in fact, demolition or why Tutor found that type of work and Atlantic ineligible for the CCIP. Attachment 3 to the Tutor-Abbonizio subcontract gave Tutor "sole discretion" to exclude any tier subcontractor from the CCIP "even if such party or entity is otherwise eligible," and the CCIP Manual states Tutor "has the right to include or exclude ANY SUBCONTRACTOR of ANY tier from

participating in the CCIP at their sole discretion." (Emphasis omitted). Both documents, together with the CCIP policies, must be read together and construed as one contract. They are part of the same transaction and may be explained by reference to the other. Lawrence, 14 N.J. at 7; Schlossman's, Inc., 3 N.J. at 435; Nester, 301 N.J. Super. at 210.

Nevertheless, Travelers argues if one was to rely on the language in the CCIP documents, then Zurich also becomes subject to the formal cancellation notice requirements in those documents, along with the regulatory and public policy mandates that prohibit mid-term policy cancellations once coverage is established via receipt of a COI. Thus, because Zurich failed to follow those requirements and provide specific and clear notice of coverage termination, Atlantic was still enrolled in Zurich's CCIP CGL policy and AGLIC's CCIP excess policy at the time of the Hood accident.

Notwithstanding the evidence that Zurich and AGLIC provided Atlantic no specific and clear notice of the CCIP policy cancellations, we are satisfied Atlantic's undisputed knowledge that the policies had been cancelled because of its ineligibility for CCIP enrollment warrants affirming the judge's grant of Zurich's and AGLIC's summary judgment motions.

A-3358-22

Appellants contend the judge erred by finding that New Jersey's statutes, regulations, and general common law policy of enforcing formal cancellation notice requirements to protect insureds do not apply to CCIPs or to Atlantic. They argue because Atlantic received no formal notice of coverage cancellation from Zurich, its CCIP CGL and excess policies were not properly cancelled, and therefore Atlantic was still covered under those policies at the time of Hood's accident.

The "legal duties owed by an insurer can arise by express contractual provision, by statute, or by court-made common law."  3 Jordan R. Plitt et al., Couch on Insurance, § 40:7 (3d ed. updated Dec. 2025).  "Cancellation is a term ordinarily applicable to the procedure by which a policy already issued and in force is terminated . . . ."  Lopez v. N.J. Auto. Full Ins. Underwriting Ass'n, 239 N.J. Super. 13, 19 (App. Div. 1990).

N.J.S.A. 17:29C-1 provides "insurance companies organized under the laws of this State or organized to do business in this State . . . shall include provisions in policies of insurance . . . whereby [thirty] days' written notice shall be given . . . to the insured[] of the cancellation of any such policy."  N.J.S.A. 17:29C-1 also gives the Commissioner of the Department of Banking and Insurance statutory authority to promulgate rules and regulations regarding

insurance cancellation notices. <u>Piermount Iron Works, Inc. v. Evanston Ins. Co.</u>, 197 N.J. 432, 439-40 (2009).

Under that authority, the Commissioner adopted N.J.A.C. 11:1-5.2(a), which requires "[a]ll fire and casualty policies of insurance, except accident and health policies," to "provide for the issuing company to give . . . [t]hirty days' written notice to the insured of the cancellation of any policy." The Commissioner also adopted N.J.A.C. 11:1-20.2, governing cancellation notice requirements in all commercial insurance policies and stating:

> No cancellation, other than a cancellation based upon nonpayment of premium or for moral hazard . . . shall be valid unless notice is mailed or delivered by the insurer to the insured, and to any person entitled to notice under the policy, not more than 120 days nor less than 30 days prior to the effective date of such cancellation except, however, that failure to send such notice to any designated mortgagee or loss payee shall invalidate the cancellation only as to the mortgagee's or loss payee's interest.
>
> [N.J.A.C. 11:1-20.2(d).]

Under N.J.A.C. 11:1-20.2(g), "[n]o . . . cancellation shall be valid unless the notice contains the standard or reason upon which the termination is premised and specifies in detail the factual basis upon which the insurer relies." N.J.A.C. 11:1-20.2(i) provides, "No . . . cancellation shall be valid unless notice

81

thereof is sent . . . [b]y certified mail . . . or . . . first class mail," and the insurer retains the requisite proof of mailing.

N.J.A.C. 11:1-20.3 governs policy provisions relating to cancellation, and states all commercial insurance policies must contain the following mandatory boilerplate language that advises insureds of the requirements for notification in connection with cancellation of an insurance policy:

> Pursuant to New Jersey law, this policy cannot be cancelled . . . for any underwriting reason or guideline which is arbitrary, capricious[,] or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel . . . this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.
>
> [N.J.A.C. 11:1-20.3(a).]

N.J.A.C. 11:1-20.3(a) also requires including a statement that states: "This provision shall not apply to any policy that has been in effect for less than [sixty] days at the time notice of cancellation is mailed or delivered, unless the policy is a renewal policy."

N.J.A.C. 11:1-20.4(d) provides "[i]n addition to the approved guidelines set forth in [N.J.A.C. 11:1-20.4](b)[,] . . . an insurer may use other guidelines for cancellation . . . provided such guidelines are not arbitrary, capricious[,] or

82

unfairly discriminatory." Significantly, the scope of section 11:1-20 is set forth in N.J.A.C. 11:1-20.1(c), which reads, "Policies may provide terms more favorable to policyholders than are required by these rules. The rights provided by these rules are in addition to and do not prejudice any other rights policyholders may have at common law, or under statutes and regulations."

The regulation further provides:

> This subchapter shall apply to all commercial insurance policies that are in force, issued, or renewed by companies licensed to do business in this State except workers' compensation insurance, employers liability, fidelity, surety, performance and forgery bonds, ocean marine and aviation insurance, and accident and health insurance and any policy written by a surplus lines insurer. With the exception of N.J.A.C. 11:1-20.3 and 11:1-20.4(d), this subchapter shall not be applicable to multi-state location risks or policies subject to retrospective rating plans.
>
> [N.J.A.C. 11:1-20.1(a) (emphasis added).]

In In re N.J.A.C. 11:1-20, 208 N.J. Super. 182, 186 (App. Div. 1986), we explained the regulations were designed "to curb what the [C]ommissioner conceived as abuses by insurance companies, including midterm policy cancellations, blanket nonrenewals, cancellations of entire lines of insurance and midterm premium increases without adequate reasons or notice to the insureds." Similarly, in Piermount, 197 N.J. at 440, wherein the insurer had

failed to provide a written nonrenewal notice, our Supreme Court recognized both "New Jersey's strong policy in favor of protecting insurance consumers" and the "clear intention [in the Commissioner's regulations] to combat unfair cancellations and the prevalence of nonrenewals in the commercial and homeowner's insurance markets." The Court explained that "[n]otice allows the consumer to take protective action. It gives the insured 'the opportunity to guard against the peril of noncoverage, a peril which . . . can arise out of miscommunication among brokers, agents, insureds[,] and carriers.'" Id. at 441 (omission in original) (quoting Echevarias v. Lopez, 240 N.J. Super. 104, 108 (App. Div. 1990)).

Here, the judge rejected the arguments that the CCIP policies provided coverage to Atlantic for the Hood lawsuit because Zurich, AGLIC and/or Alliant had not complied with any cancellation notice requirements. In his oral decision, the judge found because Atlantic had no contractual relationship with Zurich and AGLIC, they had "no duty" to send any cancellation notice to Atlantic. Because Atlantic had obtained its own insurance coverage before working on the project, the judge also found "no relevance to the notice provision," concluding that none of the cases or regulations governing a policy cancellation notice applied here.

In his written decision, the judge reiterated those findings. Because Tutor was the only entity authorized to disenroll a subcontractor from the CCIP, thereby cancelling insurance coverage for that subcontractor, the judge agreed with Zurich's Kelly. She had likened the relationship between Tutor and Atlantic to a policyholder adding or removing vehicles to an automobile policy during the year: the policy remains in effect, only the scheduled vehicles change. The judge further determined "the plain language of the unambiguous statutes and regulations reveals they do not apply to the circumstances at issue or to a CCIP."

He explained plaintiffs' arguments

> miss[] the point because the CCIP [p]olicies were never cancelled (or nonrenewed). Rather, the Zurich [p]olicy and AGLIC [p]olicy remained in effect for the [p]roject for all other entities that were permitted to enroll under the CCIP, and they continued to apply to Tutor['s] . . . other projects insured under the CCIP. Thus, these administrative codes are inapplicable. Atlantic was [dis]enrolled less than [twenty-four] hours after the erroneous enrollment based on the request of Tutor[,] . . . which had the absolute and sole authority to make such a request under the relevant policy terms.

Specifically, with regard to N.J.A.C. 11:1-5.2(a), the judge determined the arguments "ignore the plain language and clear intent of the Code, which is that Subchapter 5 applies to property policies under the Fair Access to Insurance

A-3358-22

Requirements Plan (the []FAIR Plan[]) implemented pursuant to" N.J.S.A. 17:37A-1. The judge explained the FAIR Plan was "created by the insurance industry as a means to make property insurance more readily available to people who have difficulty obtaining coverage from voluntary market insurers because their property is considered [']high risk.'" (Quoting About NJUIA, NJIUA, https://portal.njiua.org/Home/About (last visited July 25, 2023)). That Plan "'insures homes, mobile homes, rental units, most commercial buildings[,] and business property' by providing 'basic property coverage,' but does not provide theft or personal liability coverage." (Quoting NJDOBI, Off. of Prop. and Casualty, https://www.nj.gov/dobi/division_insurance/propcas.htm#fair (last visited July 25, 2023)).

Accordingly, the judge concluded N.J.A.C. 11:1-5.2(a) and the FAIR Plan have "no applicability to CCIP, OCIP[,] or Wrap-Up programs . . . and to do so would contradict the parties' carefully crafted and unambiguous contractual terms, which are designed to provide cost-effective and efficient insurance coverage to complex construction projects involving multiple phases of work and numerous subcontractors."

Regarding the requirements in N.J.A.C. 11:1-20.2(d), the judge found their applicability "even more tenuous." He explained that "[n]ot only is it

unclear whether this section creates a private cause of action, but N.J.A.C. []

11:1-20.1, which details the scope of Subchapter 20, plainly states it does not

apply here." He explained:

> Not only does this Code section not apply because the CCIP contained a worker's compensation component, it also does not apply because the CCIP covered . . . [Tutor] projects located throughout the country at the time of the [a]ccident in Pennsylvania, including several projects in California and Louisiana. Thus, the plain language of N.J.A.C. [] 11:1-20.2 makes clear that its requirements do not apply to an insurance program covering multi-state location risks such as the CCIP here.

Appellants argue CCIP policies are subject to the same requirements as

all other insurance policies in New Jersey, and once Atlantic became a Named

Insured under the CCIP by virtue of receiving the COI from Alliant, however

brief or erroneous, Tutor's contractual right to control the CCIP became

immaterial to Zurich's notice obligations to its insureds. They further argue

Atlantic's CCIP coverage was not a multi-state location risk under the

regulations because Atlantic itself was a single-location New Jersey company

doing certain work on a single project, even if that project was in Pennsylvania.

Additionally, appellants contend our courts favor a strong public policy

favoring the reasonable expectations of insureds and, therefore, require

appropriate notice of insurance policy changes in all contexts for the fairness

87

and protection of insureds. Plaintiffs, specifically, assert the lack of a formal cancellation notice can give rise to a legitimate concern that there is no recourse for insured subcontractors if higher-tiered contractors or CCIP insurers could capriciously cancel their insurance. Quoting Miller v. Reis, 189 N.J. Super. 437, 444 (App. Div. 1983), plaintiffs insist our courts resist "implied cancellation," as "insurance policies are complex contracts of adhesion, prepared by the insurer and not subject to negotiation." According to appellants, the judge therefore erred by viewing the case from Tutor's contractual perspective instead of Zurich's insurance cancellation obligations.

We agree with the judge's finding that the cancellation regulations imposing formal timing, mailing, and record retention requirements on insurers do not apply to a CCIP with multiple-state risks, as here. N.J.A.C. 11:1-20.1(a) (emphasis added) states: "With the exception of N.J.A.C. 11:1-20.3 and 11:1-20.4(d), this subchapter shall not be applicable to multi-state location risks." However, N.J.A.C. 11:1-20.3 provides all commercial insurance policies must contain boilerplate language advising insureds of the requirements for notification in connection with the cancellation of an insurance policy, and N.J.A.C. 11:1-20.4(d) reads "an insurer may use other guidelines for cancellation . . . provided such guidelines are not arbitrary, capricious or unfairly

discriminatory."  See DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 307 (2005) ("When interpreting a statute or regulation, we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage.").

Regulatory inapplicability does not vitiate an insurer's obligation to provide notice of coverage changes, which still must be clearly and specifically conveyed even in the absence of the formal mailing and record retention provisions of the regulation.  See Skeete v. Dorvius, 184 N.J. 5, 8 (2005).  In fact, "the question whether a party is insured at all may be a separate matter susceptible of resolution by reference to any relevant matter such as an underlying contract . . . which clarifies the intendments of the parties in apportioning responsibility and providing for insurance coverage."  Pennsville Shopping Ctr. Corp. v. Am. Motorists Ins. Co., 315 N.J. Super. 519, 523 (App. Div. 1998) (considering terms of tenant's lease when interpreting ambiguous provisions of tenant's insurance policy).

Here, Zurich's CCIP CGL policy set a ninety-day notice requirement "[f]or any statutorily permitted reason for cancellation," while the CCIP Manual set a thirty-day notice requirement.  The COI also contained a cancellation requirement in a pre-printed statement that read:  "Should any of the above

89

described policies be cancelled before the expiration date thereof, notice will be delivered in accordance with the policy provisions." In addition, Attachment 3 stated Tutor "may, for any reason, . . . request that any [s]ubcontractor of any tier withdraw from the CCIP upon thirty . . . days written notice."

It is undisputed that Atlantic was given no formal notice of the cancellation or coverage change of the CCIP policies as required by these CCIP documents. Thus, we disagree with the judge's finding that Zurich's failure to provide any notice of CCIP coverage change did not violate the requirements in the CCIP documents. However, our courts have not required compliance with cancellation requirements in a contract or regulation where the insured admits receipt of the cancellation notice. Pawlick v. N.J. Auto. Full Ins. Underwriting Ass'n, 284 N.J. Super. 629, 634 (App. Div. 1995).

Here, it is undisputed that by the time of Hood's accident, Atlantic knew it was ineligible but had been erroneously enrolled in the CCIP, and that the related CCIP policies had been cancelled. Atlantic had received Attachment 3 from Abbonizio, informing it that eligibility for the CCIP included coverage under the three policies. Further, Atlantic's actions demonstrate it knew it was no longer covered under the CCIP policies. Hence, we reject appellants' arguments and affirm the judge's ultimate finding that Atlantic was not covered

under the CCIP policies at the time of the Hood accident and was aware of its uncovered status.

## C. Negligence Claims Against Alliant.

Plaintiffs contend the judge erred by failing to find Alliant was liable to provide coverage to Atlantic due to its own negligence as Atlantic's insurance broker and fiduciary, even if Atlantic was not enrolled in the CCIP at the time of the Hood accident.

In his supplemental decision, the judge rejected plaintiffs' claims that Alliant was negligent in failing to procure coverage for Atlantic, stating "there is no theory under which Alliant can be held responsible for the money Travelers and Evanston spent to defend and settle the Hood [l]awsuit." Addressing causation, the judge found "it is undisputed factually that Alliant played no role in excluding Atlantic from the CCIP." Relying on the fact that "[Tutor] had the absolute and sole discretion to include and exclude subcontractors and sub-subcontractors – including Atlantic – from the CCIP," the judge found "no facts of record from which a jury could find that Alliant affirmatively or, by virtue of its inaction, caused Atlantic to be [dis]enrolled from the CCIP."

The judge also found that because Atlantic had sufficient insurance coverage from Travelers and Evanson, Atlantic could not "prove damages." In

that regard, the judge rejected plaintiffs' newly minted argument that Atlantic had suffered damages of increased insurance premiums and newly incurred counsel fees from having to retain its own counsel to secure its insurers' coverage for the Hood lawsuit. The judge found Atlantic failed to produce any credible evidence to support those "last[-]minute allegations" and had provided no expert testimony as required.

Plaintiffs argue the judge erred because Alliant, in its role as CCIP program administrator, was responsible for ensuring that all subcontractors were properly enrolled in the CCIP, thus making Alliant an insurance broker and fiduciary of each subcontractor, including Atlantic. Accordingly, absent a formal notice of cancellation from Zurich or Alliant, plaintiffs contend Atlantic was entitled to reasonably rely on the documentation it received from Alliant confirming its CCIP enrollment and coverage. As a result, plaintiffs assert Alliant is liable for Atlantic's defense and indemnification in the Hood lawsuit.

We reject plaintiffs' arguments and agree with the judge that there is no factual or legal support for a claim of negligence against Alliant. Indeed, plaintiffs cannot prove causation or damages to support a negligence claim.[7]

_____

[7] Based on our conclusion, we need not consider plaintiffs' expert report submitted to support their argument that Alliant breached its fiduciary duties owed to Atlantic.

Atlantic cannot prove it suffered losses because its own insurers defended it in the Hood lawsuit and paid the settlement. Further, it is undisputed Alliant played no role in excluding Atlantic from the CCIP. According to Attachment 3 and the CCIP Manual, Alliant was Tutor's CCIP administrator for the project and, therefore, only Tutor's agent. It was Tutor, not Alliant, that had sole discretion in excluding any tier subcontractor from the CCIP at any time as an ineligible party, and it was undisputed the CCIP would not apply to ineligible parties, even if they happened to be erroneously enrolled.

Based on our decision, we need not consider appellants' remaining arguments, some of which lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3358-22